United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 15, 1998 Decided August 28, 1998 

 No. 97-5304

 Fraternal Order of Police, 

 Appellant

 v.

 United States of America, 

 Appellee

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 97cv00145)

 William J. Friedman, IV argued the cause and filed the 
briefs for appellant.

 Robert M. Loeb, Attorney, U.S. Department of Justice, 
argued the cause for appellee. With him on the brief were 
Frank W. Hunger, Assistant Attorney General, Wilma A. 
Lewis, U.S. Attorney, and Mark B. Stern, Attorney, U.S. 
Department of Justice.


 Before: Williams, Ginsburg and Randolph, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Williams, Circuit Judge: The Fraternal Order of Police, an 
association of law enforcement officers, brought suit challeng-
ing certain provisions of the 1996 amendments to the Gun 
Control Act of 1968, 18 U.S.C. s 921 et seq. The Order 
alleged that these provisions exceeded Congress's power un-
der the Commerce Clause, and also that they ran afoul of the 
Second, Fifth, and Tenth Amendments. The district court 
granted summary judgment for the government. Finding 
that the Order has standing to raise its claim under the equal 
protection component of Fifth Amendment due process, see 
Bolling v. Sharpe, 347 U.S. 497, 499 (1954), and finding merit 
in that claim, we reverse.

 * * *

 As relevant here, the essence of the 1996 amendments was 
to (1) extend a pre-existing criminalization of firearms posses-
sion by persons convicted of domestic violence felonies to 
persons convicted of domestic violence misdemeanors; and (2) 
to withhold from the misdemeanants--but not the felons--an 
exception for firearms issued for the use of any state or 
locality (the so-called "public interest exception"). The Gun 
Control Act, now as before, also applies to anyone who 
supplies a person with a firearm in the face of this and 
related proscriptions.

 The amendments bringing about this change are as follows: 
Section 922(d)(9) of Title 18 makes it illegal to provide a 
firearm to any person "convicted in any court of a misde-
meanor crime of domestic violence"; s 922(g)(9) prohibits 
such misdemeanants from possessing or receiving firearms. 
Section 922(g)(9) limits its scope to possession in or affecting 
interstate commerce, or firearms transported in interstate 
commerce; s 922(d)(9) contains no similar limitation. Relief 
from the disability thus imposed is governed in part by 
s 925(a)(1), which provides that the prohibitions of s 922 
generally do not apply to firearms issued for the use of "any 

State or any department, agency, or political subdivision 
thereof." Section 925(a)(1) explicitly excludes ss 922(d)(9) 
and 922(g)(9) from this public interest exception.

 Sections 922(d)(9) and (g)(9) thus forbid the states to arm 
those members of their police forces, militias, or National 
Guards who possess disabling misdemeanor convictions; they 
criminalize both the officers' acceptance of the states' fire-
arms and the provision of the firearms by any person, includ-
ing (presumably) any state's representative. The disability 
operates regardless of the date of the conviction. So the new 
bans can be expected to affect a significant number of current 
police officers. The Joint Appendix contains several newspa-
per articles recounting instances in which officers were re-
quired to turn in their guns, and it was in view of this 
prospect--though not solely on behalf of members directly 
threatened with the firearm disability--that the Order 
brought suit.

 * * *

 The threshold question on appeal is whether the Order has 
standing to pursue its claims. We find it necessary to 
address only the standing claim based on the interests of 
members who are chief law enforcement officers ("CLEOs"). 
Although the Order's briefs make vague allusions to some 
legal theories that would entail broader relief than is suitable 
for the Equal Protection claim brought by the Order on 
behalf of the CLEOs, they fail to develop such theories. So 
there is no need to assess the standing possibly underlying 
such inchoate claims.

 For a party to establish the sort of "case" or "controversy" 
over which Article III creates federal jurisdiction, it must 
satisfy the now familiar tripartite requirements of "(1) an 
injury in fact, (2) a causal relationship between the injury and 
the challenged conduct, and (3) a likelihood that the injury 
will be redressed by a favorable decision." United Food and 
Commercial Workers Union Local 751 v. Brown Group, Inc., 
517 U.S. 544, 551 (1996). An association such as the Order, 
which alleges no injury to itself as an organization, may, 


according to Hunt v. Washington State Apple Advertising 
Comm'n, 432 U.S. 333 (1977), sue on behalf of its members if 
it can show that "(a) its members would otherwise have 
standing to sue in their own right; (b) the interests it seeks 
to protect are germane to the organization's purpose; and (c) 
neither the claim asserted nor the relief requested requires 
the participation of individual members in the lawsuit." Id. 
at 343. The first of these elements ensures the presence of a 
case or controversy and is constitutional in nature. See 
Warth v. Seldin, 422 U.S. 490, 511 (1975). It is the only one 
the government contests and the only one with respect to 
which we can see any difficulty.

 Several CLEOs allege that enforcement of the 1996 amend-
ments conflicts with their obligations under state law. Al-
though there is no indication that this is true in the hard core 
sense of federal law requiring any CLEO to do something 
state law forbids (or vice versa), it seems true in the broader 
practical sense that if a CLEO complies with the domestic 
violence misdemeanor provisions, he will find himself, in any 
enforcement activity requiring firearms, unable to use officers 
who fall under the federal ban, even where in his judgment it 
is highly desirable or even critical to use such officers. The 
government presents no reason to think that this interference 
should not qualify as an Article III injury, and we can see 
none.

 There remains the issue of whether the CLEOs would have 
"prudential standing," i.e., whether the interests they seek to 
advance are "arguably within the zone of interests to be 
protected or regulated by the statute or constitutional guar-
antee in question." Ass'n of Data Processing Service Orgs. v. 
Camp, 397 U.S. 150, 153 (1970).1 As to the equal protection 

__________
 1 Whether a prudential defect in a member's standing translates 
to a constitutional defect in the association's is a nice question. 
Superficially, one might conclude that it would, since the cases treat 
the first element of the Washington Apple test as (entirely) consti-
tutional. See, e.g., United Food and Commercial Workers, 517 
U.S. at 554-55. But since this constitutional character stems from 
the case or controversy requirement, see id., and prudential defects 

claim (the only claim it is necessary to reach), of course, the 
CLEOs are not members of the class that the statute is said 
to illegally disadvantage--law officers convicted of domestic 
violence misdemeanors, who are barred from the benefits of 
the public interest exception (as opposed to law officers 
convicted of domestic violence felonies, who are not). But 
where a person is effectively used by the government to 
implement a discriminatory scheme, he may, as we held in 
Lutheran Church-Missouri Synod v. FCC, 141 F.3d 344, 350 
(D.C. Cir. 1998), "attack that scheme by raising a third 
party's constitutional rights." There we followed Barrows v. 
Jackson, 346 U.S. 249, 259 (1953), which allowed a white 
homeowner to invoke the equal protection rights of non-
Caucasian third parties in resisting the petitioner's effort to 
enforce a racially restrictive covenant, and Craig v. Boren, 
429 U.S. 190, 194-97 (1976), which allowed a licensed beer 
vendor to invoke the equal protection claims of males aged 18 
to 21 who were barred from beer purchase by a statute that 
allowed purchases by females of that age.

 Although neither Barrows nor Craig is crystal clear as to 
just when a person whose injury qualifies under Article III 
may invoke the interests of a third party, the Court in Craig 
seemed to embrace the proposition asserted in a student law 
review note, namely, that he should be able to assert those 
third-party rights that would be infringed by his compliance. 
See 429 U.S. at 195, citing Note, Standing to Assert Constitu-
tional Jus Tertii, 88 Harv. L. Rev. 423, 432 (1974). As any 
CLEO who gave a firearm to a law enforcement officer who 
had been convicted of a domestic violence misdemeanor would 
be liable himself under s 922(d)(9), his compliance (i.e., not 
supplying the officer with the gun) would indeed defeat the 
right-holder's interest. Thus CLEOs have standing to assert 
the equal protection rights of police officers--members or 
not--threatened with deprivation of their firearms; the pres-

__________
do not affect the existence of a case or controversy, it seems more 
likely that a member's lack of prudential standing translates to a 
similar prudential failing for the association.


ence of CLEOs as members gives the Order standing to 
makes these claims as well.

 * * *

 Equal protection analysis is substantially identical under 
the Fifth Amendment and the Fourteenth. See Adarand 
Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995). Usually 
the outcome turns largely on the level of scrutiny to be 
applied. If a law neither burdens a fundamental right nor 
targets a suspect class, courts must uphold the legislative 
classification so long as it bears a rational relation to some 
legitimate end. See, e.g., Heller v. Doe, 509 U.S. 312, 319 
(1993). Laws that fall into either of the above categories, 
however, are subjected to strict scrutiny. See, e.g., City of 
Cleburne v. Cleburne Living Center, 473 U.S. 432, 439-40 
(1985) (discussing tiers of scrutiny). The Order concedes that 
persons convicted of domestic violence misdemeanors are not 
a suspect class but asserts that the 1996 amendments impinge 
on a fundamental right--the right to bear arms guaranteed 
by the Second Amendment. The government responds that 
the Second Amendment right does not belong to individuals, 
but exists only in relation to "the preservation or efficiency of 
a well regulated militia," United States v. Miller, 307 U.S. 
174, 178 (1939), and that the 1996 amendments do not restrict 
state militias.

 Analysis of the character of the Second Amendment right 
has recently burgeoned. See, e.g., Akhil Reed Amar, The 
Bill of Rights 257-67 (1998); David C. Williams, Civic Repub-
licanism and the Citizen Militia: The Terrifying Second 
Amendment, 101 Yale L.J. 551, 572-86 (1991); compare 
Hickman v. Block, 81 F.3d 98, 101-03 (9th Cir. 1996), with 
United States v. Gomez, 92 F.3d 770, 774 n.7 (9th Cir. 1996). 
Despite the intriguing questions raised, we will not attempt to 
resolve the status of the Second Amendment right, for we 
find that the 1996 amendments fall into the narrow class of 
provisions that fail even the most permissive, "rational basis," 
review. See, e.g., City of Cleburne, 473 U.S. 432.

 Section 925 extends the "public interest" exception to all 
sources of the firearm disability except domestic violence 
misdemeanors. It thus allows the states to arm police offi-
cers convicted of violent felonies, and even crimes of domestic 
violence so long as those crimes are felonies, while withhold-
ing this privilege with respect to domestic violence misde-
meanors. No reason is offered for imposing the heavier 
disability on the lighter offense. The government's brief 
argues that a special focus on domestic violence as compared 
to other misdemeanors is rational, and we agree. The defect 
is the neglect of more severe crimes of domestic violence, 
about which the government says nothing.

 A conceivable justification comes to mind. As a law sur-
vives rational basis review if it is rational under any "reason-
ably conceivable state of facts," Heller v. Doe, 509 U.S. 312, 
320 (1993) (citation omitted), we address this despite the 
government's having failed to mention it. Most states appear 
to bar convicted felons from possessing guns. See, e.g., Cal. 
Penal Code s 12021(a)(1) (felon's possession of firearm is 
felony); North Carolina Stat. s 14-415.1 (same) Oklahoma 
Stat. Title 21 s 1283 (same); Rhode Island Gen. Laws 
s 11-47-5 (same); Texas Penal Code s 46.04 (same); Wis-
consin Stat. s 941.29 (same); Wyoming Stat. s 6-8-102 
(same). Few--perhaps only New York--provide any public 
interest exception. See N.Y. Penal L. s 265.20 (exempting 
New York military, police officers, and peace officers). The 
government might therefore argue that federal law has 
stepped in merely to fill a practical gap: concluding that all 
persons guilty of domestic violence should be barred from 
possession of firearms, without regard to public interest, but 
noting that the states have satisfactorily addressed the issue 
except for the misdemeanor offender, Congress has taken 
care of this neglected problem. But this analysis would allow 
a rougher notion of justice than even "rational basis" review 
allows.

 The problem is that the states' laws are neither sufficiently 
consistent, nor sufficiently severe, to make this a rational 
approach. New Hampshire, for example, requires three felo-
nies for the prohibition to attach. See N.H. Stat. Title XII 
s 159:3-a. Vermont does not prohibit gun possession by 


felons who are convicted but never incarcerated. McGrath v. 
United States, 60 F.3d 1005, 1007 (2d Cir. 1995). As we have 
noted, at least New York seems to offer a public interest 
exception. And while the laws of most states do bar felons 
from possessing firearms even in the public interest, many 
states have disabilities of limited duration, and the duration 
varies from state to state. See, e.g., Maine Rev. Stat. Title 15 
s 393 (application for permit allowed after five years); North 
Dakota Stat. s 62.1-02-01 (ten years); South Dakota Stat. 
s 22-14-15 (fifteen years). Once these periods have expired, 
firearm rights are restored. The resulting anomalies flow 
well beyond those normally arising from federalism. The 
worse offenders may enjoy some restoration of lost rights 
under state law, while the lesser face an implacable bar.

 The government notes, following up its point that Congress 
may distinguish between crimes of domestic and violence and 
other crimes, that a legislature does not violate the equal 
protection clause merely because it approaches an issue "one 
step at a time, addressing itself to the phase of the problem 
which seems most acute to the legislative mind." Williamson 
v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489 (1955). 
But this aspect of equal protection law is of little help for 
Congress's decision to impose a more severe regime on 
domestic violence misdemeanants than on domestic violence 
felons. Whatever precise elements may influence a state's 
classification of offenses between those two categories, what 
is uniform and undisputed is that the presence of some 
aggravating circumstance (or perhaps the absence of a miti-
gating one) is necessary to establish a felony. Of course 
Congress may take "one step at a time." But here, while 
incorporating state law (and judgments thereunder) into its 
scheme, it has stepped most harshly on those persons the 
states have systematically deemed less culpable.

 We note, finally, that the treatment of domestic violence 
misdemeanants intersects with certain anomalies in Con-
gress's provision for deferring to state law on restoration of 
civil rights. For the purposes of the firearm disability gener-
ally, 18 U.S.C. s 921(a)(20) provides that convictions for 


which civil rights have been restored do not trigger the 
disability. See United States v. Bost, 87 F.3d 1333, 1335 
(D.C. Cir. 1996) (discussing state restoration of rights). An 
equivalent provision, s 921(a)(33)(B)(ii), allows state restora-
tion of civil rights to lift the federal disability from domestic 
violence misdemeanants. But few states (if any) deprive such 
misdemeanants of civil rights. With no deprivation, there can 
be no "restoration" in the ordinary sense of the term. See 
McGrath, 60 F.3d at 1007-10 (holding that felon whose civil 
rights were not revoked could not argue that they had been 
restored). Thus the plain text of the statute seems to put 
misdemeanants who have never lost their rights in a worse 
situation than felons whose rights are restored, often by 
automatic operation of state law. See, e.g., United States v. 
Caron, 77 F.3d 1, 2-4 (1st Cir. 1996) (holding that individual-
ized restoration of civil rights is not required to lift firearm 
disability).

 This anomalous consequence of the "civil rights restored" 
provision is not confined to domestic violence misdemeanors. 
Any conviction that triggers the disability but does not de-
prive the convict of civil rights will produce a similar result. 
Thus misdemeanors carrying a sentence of more than two 
years (which count as qualifying convictions under 
s 921(a)(20)), or felonies not accompanied by revocation of 
civil rights, will also activate the federal disability with no 
prospect of relief via restoration of civil rights.

 The First Circuit has responded to this discrepancy by 
holding that the "civil rights restored" provision of 
s 921(a)(20) protects those who have never been deprived of 
civil rights. See United States v. Indelicato, 97 F.3d 627, 
630-31 (1st Cir. 1996). That case involved a person convicted 
of a misdemeanor for which state law provided a maximum 
term of two and a half years, i.e., a felony for purposes of 
s 921(a)(20). But its reasoning applies to s 921(a)(33)(B)(ii) 
equally, and in that context cuts much more deeply. So far 
as we know, no state responds to a domestic violence misde-
meanor conviction by revoking the right to vote, hold office, 
or serve on a jury. (These are the civil rights on which the 
statute focuses. See Bost, 87 F.3d at 1335.) If failure to 


revoke is treated as restoration, then ss 922(g)(9) and (d)(9) 
become entirely without effect: no conviction for a domestic 
violence misdemeanor would trigger the federal disability, 
since no such misdemeanor would qualify under s 921(a)(33). 
On the other hand, if the absence of any initial deprivation 
renders the restoration provisions inapplicable, then 
s 921(a)(33)(B)(ii), expressly inserted to provide for restora-
tion in the case of domestic violence misdemeanors, is itself 
without effect. Because we find ss 922(g)(9) and (d)(9) in 
violation of equal protection requirements independently, we 
need not address the interpretive and other issues posed by 
the "restoration" provisions.

 * * *

 This brings us to the question of remedy. The Order 
makes various alternative requests, one of which is that we 
hold s 925 inoperative. Section 928 of the Gun Control Act 
explicitly provides that the invalidation of one provision shall 
not affect the remainder of the Act. We think the most 
appropriate remedy is consequently to hold that s 925 is 
unconstitutional insofar as it purports to withhold the public 
interest exception from those convicted of domestic violence 
misdemeanors. The government may not bar such people 
from possessing firearms in the public interest while it impos-
es a lesser restriction on those convicted of crimes that differ 
only in being more serious. Of course we do not decide 
whether a broader revocation of the public interest excep-
tion--for example, from all those convicted of any crime of 
domestic violence--would be constitutional.

So ordered.