**Jerald GILLESPIE, Plaintiff–Appellant,**

**v.**

**CITY OF INDIANAPOLIS, Indianapolis Police Department, and Michael Zunk, Chief Of Police, Defendants–Appellees,**

**and**

**United States of America, Intervenor–Appellee.**

**No. 98–2691.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1998.

Decided July 9, 1999.

William J. Friedman (argued), Santa Fe, NM, for Plaintiff-Appellant.

Dale R. Simmons (argued), Office of the Corporation Counsel, City Counsel Legal Division, Indianapolis, IN, for Defendants-Appellees.

Robert M. Loeb, Mark B. Stern (argued), Department of Justice, Civil Division, Appellate Section, Washington, DC, for Intervenor-Appellee.

Before CUDAHY, RIPPLE and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

By virtue of 1996 amendments to the Gun Control Act of 1968 which prohibit persons convicted of domestic violence offenses from possessing firearms in or affecting commerce, Jerald Gillespie can no longer carry a firearm. *See* 18 U.S.C. § 922(g)(9). As a result, he has lost his job as a police officer. Gillespie filed suit against the City of Indianapolis [1] seeking to have the statute declared unconstitu-tional and his employment with the Indianapolis Police Department preserved. The United States intervened to defend the constitutionality of the statute. The district court dismissed Gillespie's complaint, rejecting each of his constitutional arguments. *Gillespie v. City of Indianapolis*, 13 F.Supp.2d 811 (S.D.Ind.1998). Gillespie appeals, renewing his arguments that the statute violates the Tenth Amendment, the equal protection component of the Fifth Amendment's due process clause, and the Second Amendment. We affirm.

## I.

Gillespie has worked as an Indianapolis police officer for more than twenty-five years. Not surprisingly, the responsibilities of that job have required him to carry and on occasion use a firearm issued to him by the Indianapolis Police Department, although never outside the state of Indiana. As a local police officer, Gillespie is subject under certain circumstances to the Indiana governor's call to serve in the state's militia (more commonly referred to as the Indiana National Guard). *See* IND. CONST. art. 5, § 12, art. 12, § 1; IND. CODE §§ 10-2-3-1, 10-2-3-2, 36-8-3-15.

In 1996, Congress approved, and the President signed into law, a number of amendments to the Gun Control Act of 1968. Among them was an amendment sponsored by New Jersey Senator Frank Lautenberg, which as codified provides that "[i]t shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C.

---

1. Gillespie also named as defendants the Indianapolis Police Department and Michael Zunk, the Chief of Police. The district court dismissed them from the case, noting that the police department is a municipal department that cannot be sued apart from the city and that Zunk was sued in his official capacity alone. *Gillespie v. City of Indianapolis*, 13 F.Supp.2d 811, 816 (S.D.Ind.1998).

§ 922(g)(9).[2] The amendment took effect immediately. A separate provision of the Gun Control Act exempts the state and federal governments from most of the firearms disabilities specified in the statute, thereby allowing members of the armed services and law enforcement agencies who might otherwise be prohibited from carrying firearms to do so in connection with their public responsibilities. 18 U.S.C. § 925(a)(1). However, by its express terms, that provision of the statute does not apply to the firearms disability set forth in section 922(g)(9). Therefore, although an individual with a prior felony conviction, see 18 U.S.C. § 922(g)(1), might theoretically be able by virtue of this exemption to carry a gun in connection with federal or state employment, a person previously convicted of a misdemeanor crime of domestic violence cannot.

In October 1995, Gillespie pleaded guilty to a misdemeanor charge of battery involving his former wife. It is undisputed that this offense constitutes a "misdemeanor crime of domestic violence" for purposes of section 922(g)(9). *See* n. 2, *supra.* Consequently, federal law renders it a felony for Gillespie to possess a firearm in or affecting commerce. Although the complaint does not allege that the gun issued to Gillespie by the Indianapolis Police Department ever moved in interstate commerce, it appears to concede that point (R. 1 ¶ 91), and Gillespie makes no argument that his service weapon might never have moved across state lines. We shall therefore assume, as Gillespie himself does, that Gillespie's possession of a service weapon would be "in or affecting commerce" and therefore within the proscription of the federal statute. *See, e.g., United States v. Wilson,* 159 F.3d 280, 286–87 (7th Cir. 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 2371, —— L.Ed.2d —— (1999).

The Indianapolis Police Department itself has concluded that Gillespie can no longer carry a firearm. Because department policy requires that every police officer be trained and equipped to possess and use a firearm, the department has further concluded that Gillespie is no longer eligible to serve as a police officer. It has accordingly notified him that he will be terminated from the department's employ.

Gillespie's complaint challenged the new federal firearms ban on several constitutional grounds, each of which the district court rejected in its thorough opinion. We

---

**2.** A "misdemeanor crime of domestic violence" is defined as a federal or state misdemeanor which "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." 18 U.S.C. § 921(a)(33)(A)(ii). The Bureau of Alcohol, Tobacco, and Firearms construes this definition to include "all misdemeanors that involve the use or attempted use of physical force (e.g., simple assault, assault and battery) if the offense is committed by one of the defined parties." Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Open Letter to All State and Local Law Enforcement Officials (last modified February 27, 1998) <http://www.atf.treas.gov/core/firearms/information/opltrleo.htm>. "This is true whether or not the State statute or local ordinance specifically defines the offense as a domestic violence misdemeanor." *Id. Accord United States v. Meade,* 175 F.3d 215, 218–223 (1st Cir.1999); *United States v. Smith,* 171 F.3d 617, 620 (8th Cir.1999).

The statute also provides that a person shall not be considered to have been convicted of such an offense unless he was represented by counsel in the misdemeanor proceeding or knowingly and intelligently waived the right to counsel, and, in cases wherein the defendant is entitled to a jury trial, he either was tried by a jury or knowingly and intelligently waived the right to a jury trial. *Id.* § 921(a)(33)(B)(i). Nor shall a person be deemed to have committed such a crime if his conviction has been set aside or expunged, or if the offense is one for which the individual has been pardoned or has had his civil rights restored, unless the pardon, expungement, or restoration of rights expressly bars the individual from shipping, transporting, possessing, or receiving firearms. *Id.* § 921(a)(33)(B)(ii).

address only the portions of Judge Barker's decision addressing claims that Gillespie pursues on appeal.

Judge Barker found that the enactment of section 922(g)(9) did not exceed the authority of Congress to regulate interstate commerce. She reasoned that because the government must in every prosecution establish that the firearm in question either was shipped or transported "in interstate or foreign commerce" or was possessed "in or affecting commerce," the firearms ban has the requisite jurisdictional nexus to interstate commerce. 13 F.Supp.2d at 822.

She also did not believe that the legislation intruded upon state sovereignty in violation of the Tenth Amendment. In her view, the statute did not supplant state domestic violence law, as Gillespie suggested. "[S]tates remain free to define and punish domestic violence crimes as they wish; however, the federal government imposes a federal firearms disability in addition to any action taken or not taken by the states." *Id.* at 819. Neither was Congress effectively dictating the qualifications of state and local officials by imposing the firearms ban. Although, as a result of the new ban, state and local law enforcement agencies might well decline to employ persons with domestic violence convictions, the federal government was not compelling that decision: "Such agencies may reassign officers to different divisions or 'desk jobs,' create special non-firearm units that use other weapons like nightsticks or remain unarmed, or even change the firearms requirement for on-duty officers." *Id.* at 820. Nor, finally, was Congress forcing the states to administer or enforce a federal regulatory program. "[Section] 922(g)(9) regulates the behavior of private individuals, not states, for individuals will be [federally] prosecuted for violation of the statute and there is no federal mandate for states to assist in regulation and enforcement." *Id.* at 821.

After determining that the statute implicated no fundamental right (*id.* at 823),

Judge Barker next concluded that the firearms ban did not deprive those convicted of domestic violence crimes of equal protection. "[P]reventing domestic violence misdemeanants from possessing a firearm is reasonably related to the legitimate government purposes of keeping firearms out of the hands of potentially dangerous or irresponsible persons and protecting victims of domestic violence from being murdered by their attackers." *Id.* at 824. She rejected Gillespie's contention that the statute has an impermissibly disproportionate impact on law enforcement officials, noting that the statute is facially neutral and that the legislative history evinces no discriminatory intent. *Id.*

Finally, Judge Barker concluded that section 922(g)(9) did not violate any rights that the Second Amendment might bestow upon Gillespie, either as an individual or in his capacity as a police officer. She found it unnecessary to decide whether the Constitution preserved a collective or individual right to bear arms or what level of scrutiny a court must apply to a restriction on that right, for she was confident that the statute would survive even strict scrutiny. The underlying government interests that she had identified (again, disarming persons that Congress reasonably believed to be dangerous or irresponsible, and protecting the victims of domestic violence from being killed) were compelling. The law was also narrowly tailored to serve those interests in the sense that the firearms ban applied only to those already convicted of domestic violence offenses. *Id.* at 827.

## II.

### A.

■ The system of government established by our Constitution is one of dual sovereignty in which the States, having ceded considerable authority to the federal government, nonetheless retain "a residuary and inviolable sovereignty." *Printz v. United States*, 521 U.S. 898, 117

S.Ct. 2365, 2376, 138 L.Ed.2d 914 (1997) (quoting The Federalist No. 39, at 245 (J. Madison)). A number of constitutional provisions reflect the conservation of state sovereignty, *see id.,* 117 S.Ct. at 2376–77, but at the heart of them lies the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

Gillespie asserts that section 922(g)(9) violates the Tenth Amendment's guarantee of state sovereignty by rendering individuals with convictions for misdemeanor ·domestic violence unable to carry firearms and, as a result, ineligible to participate in state militias. (Recall that as an Indianapolis police officer, Gillespie is subject to the Governor's call to serve in the Indiana militia.) Gillespie acknowledges that Congress does have the authority to regulate commerce among the States, and the reach of the statute is expressly limited to firearms which have a link to interstate commerce. But as applied to individuals like himself, Gillespie reasons, the statute has the effect of proscribing the intrastate possession and use of firearms for law enforcement purposes. Section 925(a)(1) avoids that consequence with respect to other provisions of the Gun Control Act by lifting the firearms disabilities for those serving state and local governments, but it leaves undisturbed the ban imposed by section 922(g)(9). In this way, Gillespie argues, the statute strips the States of their right to establish the qualifications for the officers who serve in their militias. Moreover, the statute produces that result by (in Gillespie's view) compelling state officers to implement a federal statute and by intruding upon areas of traditional state

sovereignty in violation of the Tenth Amendment.

**1.**

■ Before reaching the merits of the Tenth Amendment arguments, we must first consider whether Gillespie has standing to make them. The United States contends that he does not. It reasons that any aspect of state sovereignty impinged upon by the Gun Control Act is one that the State, rather than an individual, must assert. The government has the apparent support of the Supreme Court's opinion in *Tennessee Elec. Power Co. v. T.V.A.,* 306 U.S. 118, 144, 59 S.Ct. 366, 372–73, 83 L.Ed. 543 (1939), which observed in passing that "absent the states or their officers," private parties "have no standing . . . to raise any question under the [Tenth] [A]mendment." *See also Nance v. EPA,* 645 F.2d 701, 716 (9th Cir.) ("insofar as the tenth amendment is design to protect the interest of states qua states," standing of private party "may be seriously questioned"), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). It is particularly inappropriate to allow a private individual to raise such ·concerns, the United States suggests, where, as here, the state or local government whose Tenth Amendment interests are being advocated is a party to the case and takes a contrary position. *See Mountain States Legal Found. v. Costle,* 630 F.2d 754, 761–62 (10th Cir.1980), *cert. denied,* 450 U.S. 1050, 101 S.Ct. 1770, 68 L.Ed.2d 246 (1981). Yet, "standing barriers have been substantially lowered" in the decades since the Supreme Court decided *Tennessee Elec. Power Co., United States v. Richardson,* 418 U.S. 166, 193, 94 S.Ct. 2940, 2954, 41 L.Ed.2d 678 (1974) (Powell, J., concurring), and a difference of opinion among the lower courts exposes the unsettled nature of the issue.[3]

---

3. Compare *Seniors Civil Liberties Ass'n v. Kemp,* 965 F.2d 1030, 1034 n. 6 (11th Cir. 1992); *Atlanta Gas Light Co. v. United States Dep't of Energy,* 666 F.2d 1359, 1368 n. 16 (11th Cir.), *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 78 (1982); and *Metrolina*

*Family Practice Group, P.A. v. Sullivan,* 767 F.Supp. 1314, 1320 (W.D.N.C.1989), *aff'd,* 929 F.2d 693 (4th Cir.) (unpublished), text in Westlaw, 1991 WL 38691 (all finding individual standing to make Tenth Amendment claims), with *Costle,* 630 F.2d at 761–62; *Ver-*

The standing requirement inheres in the constitutional limitation of the judicial power to "Cases" or "Controversies." U.S. CONST. Art. III, § 2. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 64, 117 S.Ct. 1055, 1067, 137 L.Ed.2d 170 (1997). "The essence of the standing inquiry," the Supreme Court has explained, "is whether the parties seeking to invoke the court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). That "personal stake" requires first a " 'distinct and palpable injury' to the plaintiff," *ibid.* (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)), .that is, an "injury in fact" rather than a harm that is merely conjectural, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). It requires as well "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct.'" *Duke Power*, 438 U.S. at 72, 98 S.Ct. at 2630 (quoting *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977)); *see also Citizens for a Better Environment*, 118 S.Ct. at 1016–1017; *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. Finally, it must be likely that the court will be able to redress the plaintiff's injuries through the exercise of its remedial powers. *Duke Power*, 438 U.S. at 74, 98 S.Ct. at 2631; *see also Citizens for a Better Environment*, 118 S.Ct. at 1017; *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136.

The standing argument that the United States advances can in part be understood as one focused on the nexus between the injury of which Gillespie complains and the constitutional right he is asserting. Practically speaking, the Gun Control Act as amended deprives Gillespie of the ability to carry a gun, and any constitutional defect that he can identify in the statute, including a violation of the Tenth Amendment, paves the way to relief, because it will render the firearms disability imposed upon him void. In pragmatic terms, his standing is therefore easy to appreciate. The theoretical nexus between his injury and any violation of the Tenth Amendment, however, is less clear. Yes, Gillespie is constrained by the statute, but is he really injured by any Tenth Amendment violation reflected in that statute? The Tenth Amendment protects the sovereignty of the States, and Gillespie's individual ability to carry a gun has nothing to do with Indiana's status as a sovereign. True enough, before Congress stepped in, Indiana had not chosen to bar those convicted of domestic violence offenses from possessing guns, and indeed it might never have elected to do so. But it *could* have done so, and in that event, Gillespie would be in the very same situation he finds himself today. Any injury to him by virtue of a Tenth Amendment violation is in this way incidental; it is really the State's ox being gored.

*Duke Power* rejects any categorical requirement that there be a logical nexus between the plaintiff's injury and the na-

*mont Assembly of Home Health Agencies, Inc. v. Shalala*, 18 F.Supp.2d 355, 370–71 (D.Vt. 1998) (both finding that private organizations lacked standing to make Tenth Amendment claims), and *Travis v. Reno*, 12 F.Supp.2d 921, 923 (W.D.Wis.) (acknowledging "compelling doubts" regarding standing of individual plaintiffs to invoke Tenth Amendment, but finding it unnecessary to resolve the question given presence of State plaintiffs), *rev'd*, 163 F.3d 1000, 1002 (7th Cir.1998) (likewise finding it unnecessary to assess standing of individual plaintiffs), *petition for cert. filed*, 67 U.S.L.W. 3717 (U.S. May 11, 1999) (No. 98–1818).

ture of the constitutional right he asserts, however. The plaintiffs in *Duke Power* were individuals who lived and worked in proximity to the sites of two planned, but not yet constructed, nuclear power plants. They filed suit to have the Price–Anderson Act, 42 U.S.C. § 2210, declared unconstitutional. That statute establishes limitations on the liability of those involved in the design and construction of nuclear power plants. The prospective injuries that the Court found sufficient to convey standing on the plaintiffs were the types of adverse effects that a nuclear power plant could be expected to visit upon those living and working near it: the release of small amounts of radiation into the surrounding air and water and a reduction in property values, for example. *See* 438 U.S. at 72–73, 98 S.Ct. at 2630. Those injuries were "fairly traceable" to the Price–Anderson Act, the Court concluded, because without the limitation of liability imposed by that statute, some vital participants in the construction of nuclear plants—including architects, engineers, and smaller manufacturers of component parts—would likely have withdrawn from the industry. The liability protection afforded by the statute thus eliminated a major obstacle to the construction of the nuclear plants from which the plaintiffs anticipated injury. *Id.* at 75–77, 98 S.Ct. at 2631–32. A declaration that the act was unconstitutional would to that extent prevent the plaintiffs' prospective injuries by rendering the construction of the plants they feared unlikely. *See id.* at 76–77, 98 S.Ct. at 2632.

Notwithstanding this pragmatic connection between the plaintiffs' injuries and the statute they were challenging, the power company opposing their suit contended that they lacked standing because there was no nexus between these injuries and the particular constitutional rights being asserted. The plaintiffs were principally asserting that the statute violated the Fifth Amendment's due process clause because the limited recovery permitted by the statute was not rationally related to the losses that might occur, because the statute purportedly encouraged laxity vis à vis safety and environmental protection, and because the statute supplied no quid pro quo to the prospective victims of a nuclear accident in exchange for the abrogation of their common-law right to recover for their injuries. The bulk of the environment and health injuries claimed by the plaintiffs did not stem from the asserted due process violations, however. In fact, as the Court noted, the only category of injuries that would possess a subject-matter nexus to their due process claim would be injuries resulting from a nuclear accident causing damages in excess of the liability limits imposed by the statute. *Id.* at 78 n. 23, 98 S.Ct. at 2633 n. 23. Relying upon *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), a case that concerned taxpayer standing, the power company argued that the plaintiffs had no standing to invoke constitutional rights which were not logically related to the types of injuries they alleged.[4]

However, the Court was unwilling to extend such a requirement beyond the confines of taxpayer litigation.

> We ... cannot accept the contention that, outside the context of taxpayers' suits, a litigant must demonstrate something more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the "case or controversy" requirement of Art. III.

438 U.S. at 79, 98 S.Ct. at 2633–34.

*Duke Power* did aver to a prudential limitation on standing that returns us to the standing argument as the United

---

4. The court in *Flast* stated:

The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked.... Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged.

392 U.S. at 102, 88 S.Ct. at 1954.

States has framed it. " '[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Id.* at 80, 98 S.Ct. at 2634 (quoting *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205). That limitation, the Court explained, avoids the adjudication of rights belonging to parties not before the court (and who might choose not to assert them), and ensures that when such rights are litigated, they are asserted by those most effectively situated to advocate them. *Id.* at 80, 98 S.Ct. at 2634.

However, *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), reveals that Gillespie, in making Tenth Amendment claims, actually is asserting his own rights. At issue in *New York* were the "take title" provisions of the federal Low–Level Radioactive Waste Policy Act of 1985, 42 U.S.C. § 2021e(d)(2)(C), which required the States either to enact legislation providing for the disposal of radioactive waste generated within their borders or alternatively to deal with the waste administratively by taking title to and accepting possession of the waste. *See id.* at 153–54, 174–76, 112 S.Ct. at 2416, 2427–28. The Court concluded that Congress could not, consistent with the Tenth Amendment, compel the States to take either step. *Id.* at 176–77, 112 S.Ct. at 2428–29. One of the arguments voiced in defense of the law was that the very State making the constitutional challenge (New York), had been a party to the compromise reflected in the statute and that its officials had even spoken in support of the act's enactment before Congress. *See id.* at 180–81, 112 S.Ct. at 2431. Still, the Court reasoned, Congress was not free to violate state sovereignty by securing the "consent" of the States themselves. *Id.* at 182–83, 112 S.Ct. at 2431–32. Justice O'Connor explained:

> The Constitution does not protect the sovereignty of the States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Coleman v. Thompson,* 501 U.S. 722, 759, 111 S.Ct. 2546, 2570, 115 L.Ed.2d 640 (1991) (BLACKMUN, J., dissenting). "Just as the separation and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft,* 501 U.S. [452], at 458, 111 S.Ct. [2395], at 2400, 115 L.Ed.2d 410 (1991). See The Federalist No. 51, p. 323 (C. Rossiter ed.1961).

505 U.S. at 181–82, 112 S.Ct. at 2431.

We are therefore satisfied that Gillespie has standing to pursue a Tenth Amendment challenge to section 922(g)(9). He has suffered a concrete injury—the loss of the ability to carry a firearm, and the consequent loss of his job as a police officer. That injury can also fairly be traced to the constitutional violation that he attributes to Congress in enacting the amendments to the statute, for if we declared the statute unconstitutional, the firearms disability would be nullified and Gillespie would regain his right to carry a firearm. *See Duke Power,* 438 U.S. at 74–77, 98 S.Ct. at 2631–32. Finally, as *New York* explains, the Tenth Amendment, although nominally protecting state sovereignty, ultimately secures the rights of individuals. Gillespie consequently has standing to raise the Tenth Amendment violation notwithstanding what state or lo-

cal officials themselves may have to say about the propriety of the statute.

### 2.

The Tenth Amendment does not itself demarcate the boundary dividing state from federal authority; its text "is essentially a tautology," *New York,* 505 U.S. at 157, 112 S.Ct. at 2418, declaring only that the States retain those powers not surrendered, *id.* at 156, 112 S.Ct. at 2418. Whether Congress has invaded the province reserved to the States by the Tenth Amendment is therefore a question that must be answered by inquiring whether Congress has exceeded the limits of authority bestowed upon it by Article I of the Constitution. *See id.* at 156–57, 112 S.Ct. at 2418; *United States v. Wilson, supra,* 159 F.3d at 287. The Gun Control Act and its amendments were enacted pursuant to the Commerce Clause, which authorizes Congress to "regulate Commerce ... among the several States...." U.S. CONST. art. I, § 8, cl. 3. To resolve Gillespie's Tenth Amendment challenge to section 922(g)(9), then, we must first consider whether the provision reflects an appropriate exercise of the commerce power. Relying on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Gillespie contends that the firearms ban exceeds congressional Commerce Clause authority to the extent that it bans state and local law enforcement officials from possessing firearms wholly within the boundaries of a single State and in pursuit of their official duties. The Supreme Court in Lopez explained that the Commerce Clause permits Congress to regulate three domains: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce, as well as persons and objects in interstate commerce; and (3) activities that "substantially affect" interstate commerce. *Id.* at 558–59, 115 S.Ct. at 1629–30. *Lopez* con-

cerned a provision of the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), which criminalized the knowing possession of a firearm within a school zone. Because that provision did not purport to regulate either the channels or instrumentalities of interstate commerce or the people and things moving in interstate commerce, section 922(q) could only be justified as an exercise of the congressional power to regulate activities substantially affecting interstate commerce. 514 U.S. at 559, 115 S.Ct. at 1630. The Court concluded that the statute as written exceeded that aspect of the commerce power because on its face the provision had nothing to do with commerce or any kind of economic enterprise, it had no jurisdictional element ensuring by means of a case-by-case inquiry that a given firearm affects interstate commerce, and there were no congressional findings establishing a nexus between interstate commerce and the possession of guns in the vicinity of schools. *Id.* at 561–63, 115 S.Ct. at 1631–32.

As Judge Barker recognized, however, section 922(g)(9) includes the jurisdictional element that originally was omitted from section 922(q).[5] In other words, the statute prohibits persons convicted of domestic violence from possessing a firearm "in or affecting commerce." In the wake of *Lopez,* we have repeatedly found the inclusion of that jurisdictional element in other provisions of the Gun Control Act sufficient to overcome Commerce Clause challenges. *See United States v. Bell,* 70 F.3d 495, 497–98 (7th Cir.1995) (section 922(g)(1)); *United States v. Lee,* 72 F.3d 55, 58–59 (7th Cir.1995) (section 922(g)(1)); *United States v. Bradford,* 78 F.3d 1216, 1222–23 (7th Cir.), *cert. denied,* 517 U.S. 1174, 116 S.Ct. 1581, 134 L.Ed.2d 678 (1996) (section 922(g)(1)); *United States v. Lewis,* 100 F.3d 49, 51–53 (7th Cir.1996) (section 922(g)(1)); *United States v. Hardy,* 120 F.3d 76, 77–78 (7th Cir.1997) (per

---

**5.** After the Supreme Court decided *Lopez,* Congress enacted a new version of section 922(q) containing a jurisdictional element.

curiam) (section 922(u)); *United States v. Williams*, 128 F.3d 1128, 1133–34 (7th Cir. 1997) (section 922(g)(1)); *United States v. Wilson*, 159 F.3d at 285–87 (section 922(g)(8)).

Gillespie concedes that the jurisdictional language "may obviate a 'facial' constitutional challenge" to section 922(g)(9), but in his view that language does not alone suffice to validate the statute "as applied" to him. Gillespie Br. 20.

> [T]he defendants must [also] show a rational basis or substantial evidence for finding a substantial impact on interstate commerce exists, arising from the intrastate possession of a firearm in the public interest by a previously convicted misdemeanant who has carried a firearm in the public interest without incident for over 25 years.

*Id.*

We have expressly rejected such an additional showing as unnecessary, however. Like Gillespie, the defendant in *Lewis* suggested that the Supreme Court's decision in *Lopez* required the government to establish that his possession of a firearm had a demonstrable impact on interstate commerce. We noted that in *Scarborough v. United States*, 431 U.S. 563, 575, 97 S.Ct. 1963, 1969, 52 L.Ed.2d 582 (1977), which addressed the forerunner to the felon-in-possession ban now contained in section 922(g)(1), the Court found that the jurisdictional provision of the statute required no proof beyond "the minimal nexus that the firearm have been, at some time, in interstate commerce." *See* 100 F.3d at 50; *see also id.* at 52, discussing *United States v. Bass*, 404 U.S. 336, 349–50, 92 S.Ct. 515, 523–24, 30 L.Ed.2d 488 (1971) (construing statutory forerunner to section 922(g)(1) to require proof that firearm was possessed in or affecting in interstate commerce, thereby avoiding conclusion that Congress

had altered federal-state balance). Nothing in *Lopez* called the validity of this rationale into question. 100 F.3d at 52. As a result, we saw no need for proof that a given firearm or a particular individual's possession of that firearm had a substantial impact on commerce. *Id.* at 51–53. In the aggregate, it was easy to see that the statute regulates interstate gun trafficking with the obvious aim of keeping firearms out of the hands of criminals; and this is the very kind of regulation that the commerce power permits. *See id.* at 52–53, quoting *United States v. Chesney*, 86 F.3d 564, 571–72 (6th Cir.1996), *cert. denied,* 520 U.S. 1282, 117 S.Ct. 2470, 138 L.Ed.2d 225 (1997), and *United States v. McAllister*, 77 F.3d 387, 390 (11th Cir.), *cert. denied,* 519 U.S. 905, 117 S.Ct. 262, 136 L.Ed.2d 187 (1996). All that need be shown in the individual case, then, was that the firearm in question had previously moved across state lines. 100 F.3d at 51–53.

> A single journey across state lines, however remote from the defendant's possession, is enough to establish the constitutionally minimal tie of a given weapon to interstate commerce, and to bring the defendant's possession of the gun within a framework of regulation whose connection to interstate commerce is more apparent.

*Id.* at 52. *See also Wilson*, 159 F.3d at 286–87; *Bradford*, 78 F.3d at 1222–23; *United States v. Farnsworth*, 92 F.3d 1001, 1006–07 (10th Cir.), *cert. denied,* 519 U.S. 1034, 117 S.Ct. 596, 136 L.Ed.2d 524 (1996); *McAllister*, 77 F.3d at 390.[6]

Gillespie makes no claim that the weapon issued to him by the Indianapolis Police Department might never have moved across state lines, and in acknowledging that the gun at the least has this minimal tie to interstate commerce, he has conceded away the only basis he might have for a Commerce Clause challenge to the

---

**6.** *Cf. United States v. Robertson,* 514 U.S. 669, 671, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995) (finding it unnecessary to consider whether activities of RICO enterprise "affected" interstate commerce, where enterprise

purchased supplies and equipment in interstate commerce and hired workers from out of state and in these ways came within scope of congressional power to regulate interstate commerce).

**706**

statute. Without question, Congress has the power to regulate the interstate trade in firearms. Pursuant to that authority, it may act to stem the flow of guns to those whom it rationally believes may use them irresponsibly, including those whose convictions for domestic violence offenses reflect a propensity to inflict bodily harm upon others. The possibility that a particular individual might possess his gun solely within one state and for official purposes is irrelevant. So long as that gun has moved across state lines at least once, it is subject to the exercise of congressional Commerce Clause authority.

**3.**

■ If, as we have concluded, section 922(g)(9) reflects a valid exercise of the federal power to regulate interstate commerce, then it follows that Congress has not violated the Tenth Amendment by intruding upon an area of authority reserved to the States. *See New York v. United States, supra,* 505 U.S. at 156, 112 S.Ct. at 2417 ("[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States"); *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) ("[a]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States"); *Wilson,* 159 F.3d at 287. Gillespie suggests that the statute nonetheless poses a Tenth Amendment problem by, for the first time, making it a federal offense for someone convicted of a misdemeanor to possess a firearm, and also by reaching the

possession of firearms possessed in the public interest by state officials. Neither argument requires lengthy attention.[7]

■ Constitutionally speaking, there is nothing remarkable about the extension of federal firearms disabilities to persons convicted of misdemeanors, as opposed to felonies. The particular act criminalized by each subsection of 922(g) is the possession of a firearm (or ammunition) in or affecting commerce, an activity firmly within the scope of the commerce power.[8] *See Lopez,* 514 U.S. at 561–62, 115 S.Ct. at 1631, distinguishing *Bass, supra,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488. Congress long ago imposed this ban on felons, and because the ban applied only to guns possessed in or affecting commerce, the Supreme Court did not view the proscription as an unconstitutional intrusion upon state sovereignty. *See id.* The recent inclusion of some misdemeanants raises no new concerns. True, most misdemeanors are creatures of state law, but so are most felonies. *See Lopez,* 514 U.S. at 561 n. 3, 115 S.Ct. at 1631 n. 3. Criminalizing the possession of interstate firearms by individuals previously convicted of a state crime in no way redefines the elements of the state offense or increases the punishment meted out for that offense. *See United States v. Jordan,* 870 F.2d 1310, 1314–15 (7th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989); *see also United States v. Andaverde,* 64 F.3d 1305, 1310 (9th Cir.1995), *cert. denied,* 516 U.S. 1164, 116 S.Ct. 1055, 134 L.Ed.2d 199 (1996); *United States v. Minnick,* 949 F.2d 8, 10–11 (1st Cir.1991), *cert. denied,* 503 U.S. 995, 112 S.Ct. 1698, 118

7. Gillespie also appears to suggest that the statute amounts to an unprecedented intrusion upon state domestic law. Gillespie Br. 10–11. That is an argument made more logically with respect to 18 U.S.C. § 2261, which establishes a federal domestic violence offense. Section 922(g)(9) itself works no change upon state laws concerning domestic violence; it simply attaches a new federal consequence to a state conviction with respect to the possession of firearms in or affecting interstate commerce.

8. Of course, the statute also forbids identified persons to ship or transport a firearm or ammunition in interstate or foreign commerce or to receive any firearm or ammunition that has been shipped or transported in interstate commerce. 18 U.S.C. § 922(g). We focus on the possession of a firearm in or affecting commerce, because it is the prohibition of that activity which most directly bears on Gillespie.

L.Ed.2d 408 (1992); *United States v. Hicks*, 992 F.Supp. 1244, 1245–46 (D.Kan. 1997); *National Ass'n of Gov't Employees, Inc. v. Barrett*, 968 F.Supp. 1564, 1575–76 (N.D.Ga.1997), *aff'd. & adopted by Hiley v. Barrett*, 155 F.3d 1276 (11th Cir.1998). The statute simply employs a state conviction as the predicate for a prohibition to engage in an activity over which Congress has broad authority. *See generally Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 120, 103 S.Ct. 986, 996, 74 L.Ed.2d 845 (1983); *Lewis v. United States*, 445 U.S. 55, 66, 100 S.Ct. 915, 921, 63 L.Ed.2d 198 (1980); *see also United States v. Meade, supra*, 175 F.3d 215, 1999 WL 281076, at *8 (rejecting Tenth Amendment challenge to section 922(g)(8)).

 Nor is it constitutionally significant that the firearms ban now happens to include individuals employed in state and local law enforcement or who would otherwise be qualified to serve in state militias. The Tenth Amendment does reserve to the States and their citizens the power "to determine the qualifications of their most important government officials." *Gregory v. Ashcroft*, 501 U.S. at 463, 111 S.Ct. at 2402.[9] Yet, as Judge Barker emphasized, section 922(g)(9) is a criminal statute of general application that regulates individual behavior. 13 F.Supp.2d at 820. It singles out no one by occupation or affiliation with state or local government. To the extent that the statute renders individuals like Gillespie ineligible for employment in state and local law enforcement and ineligible to serve in a state militia, it does so incidentally and as a result of a valid congressional exercise of the commerce power. *See National Ass'n of Gov't Employ-*

*ees*, 968 F.Supp. at 1575. Congress has not superseded the criteria state and local governments employ to select those serving on their behalf; it has instead, in the exercise of its authority over interstate commerce, merely rendered some individuals unable, as a practical matter, to meet one of the criteria that state and local governments have themselves established. *See* 13 F.Supp.2d at 820; *see also Fraternal Order of Police v. United States*, 173 F.3d 898, 907 (D.C.Cir.1999). It may be, as Gillespie suggests, that exceptions from the firearms disability embodied in section 925 reflect a congressional sensitivity to state prerogatives regarding local law enforcement, participation in state militias, and the like. But he cites no authority for the proposition that Congress was required to make these exceptions. *See id.* Given the far-ranging scope of interstate commerce in the modern era, many laws founded upon the commerce power will touch upon activities formerly regulated solely by the States. *See New York*, 505 U.S. at 158, 112 S.Ct. at 2418–19.

4.

 Even in the exercise of one of its enumerated powers, Congress can run afoul of the Tenth Amendment by commandeering state officials to carry out federal mandates. *Printz v. United States, supra*, 117 S.Ct. at 2380–81; *New York v. United States*, 505 U.S. at 161, 166, 112 S.Ct. at 2420, 2423. Congress may not "compel the States to enact or administer a federal regulatory program," *id.* at 188, 112 S.Ct. at 2435, nor may it "conscript the State's officers directly" by assigning

9. *But see E.E.O.C. v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (upholding extension of Age Discrimination in Employment Act to state and local governments as a valid exercise of commerce power); *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (upholding application of Fair Labor Standards Act to local transit workers and noting, *id.* at 550, 105 S.Ct. at 1017, that "[a]part from the limitation on federal author-

ity inherent in the delegated nature of Congress' Article I powers, the principal means chosen by the Framers to ensure the role of the States in the federal system lies in the structure of the Federal Government itself"); *see also Gregory*, 501 U.S. at 464, 111 S.Ct. at 2403 ("We are constrained in our ability to consider the limits that the state-federal balance places on Congress' powers under the Commerce Clause.") (citing *Garcia*).

to them responsibility for enforcing federal laws, *Printz,* 117 S.Ct. at 2384; *see* *Travis v. Reno,* 163 F.3d 1000, 1003 (7th Cir.1998), *petition for cert. filed,* 67 U.S.L.W. 3717 (U.S. May 11, 1999) (No. 98–1818). Gillespie suggests that section 922(g)(9) effectively commandeers state and local governments by imposing a federal firearms disability that most States themselves have not chosen to impose, rendering individuals like Gillespie, previously eligible to serve in state and local law enforcement (and state militias), no longer able to do so.

We discern no respect in which the statute commandeers state governments or their officers, however. Section 922(g)(9) is not directed at States or state officials. It is, as we have already pointed out, a criminal law of general application; as such, it regulates the behavior of individuals as individuals. *See Wilson,* 159 F.3d at 287; *Gillespie,* 13 F.Supp.2d at 820. It is no doubt true, as Gillespie emphasizes, that Congress has now supplanted the choices States had previously made about the ability of misdemeanants to carry firearms. However, the Supremacy Clause (U.S. CONST. Art. VI, cl. 2), permits Congress to trump state policies on subjects that Article I empowers Congress to address. *See New York,* 505 U.S. at 159, 112 S.Ct. at 2419. That is all that Congress has done here pursuant to its authority to regulate interstate commerce. In exercising that power, Congress has not compelled the States to regulate in its stead, as it had in *New York;* the firearms ban is instead imposed directly by federal law. Nor has Congress pressed state officials into service, à la *Printz;* responsibility to enforce the firearms ban rests with federal officials. The most that can be said is that, as a result of section 922(g)(9), state and local governments can no longer, for public interest reasons (law enforcement, to name the most pertinent example) issue guns to individuals convicted of domestic violence misdemeanors. But States and municipalities are obligated to follow laws of general application that Congress enacts in the valid exercise of its authority under the Commerce Clause, *see Garcia,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016; *Travis,* 163 F.3d at 1002–03; the disarming of individuals like Gillespie merely follows from that obligation. *Minnick,* 949 F.2d at 10–11.

## B.

The Due Process Clause of the Fifth Amendment obligates the federal government to afford citizens the equal protection of the laws. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). Gillespie asserts that section 922(g)(9) is inconsistent with that obligation. The arguments that he makes in furtherance of this claim have less to do with the rational basis that Judge Barker attributed to the statute than with her threshold determination that the firearm ban need be reviewed for a rational basis and nothing more. Gillespie insists that the statute implicates a fundamental right—"the right of the people to keep and bear Arms" (U.S. CONST. amend. II)—by precluding persons convicted of domestic violence offenses from carrying firearms in the public interest.[10] Therefore, he reasons, the firearms ban can only be sustained if it is narrowly tailored to serve a compelling government interest, *e.g., Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 666, 110 S.Ct. 1391, 1401, 108 L.Ed.2d 652 (1990) (strict scrutiny), or, at the least, is substantially related to the service of an important government objective, *see United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996) (intermediate scrutiny). Gillespie Br. 24. In Gillespie's view, the

---

**10.** Gillespie no longer claims a fundamental property interest in government employment, as he did below. Gillespie Br. 26. *See Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (per curiam).

statute cannot survive more probing scrutiny than rational basis review because it is both under- and over-inclusive. It is under-inclusive, he suggests, because it removes guns from the hands of individuals convicted of domestic violence offenses, while allowing persons convicted of other violent misdemeanors to remain armed. It is at the same time over-inclusive, he believes, in the sense that it prohibits those with domestic violence offenses in their past, no matter how few or how long ago, from carrying firearms for public interest purposes.

 The premise of Gillespie's claim is foreclosed by this circuit's precedents. We shall have more to say about the nature of the right conferred by the Second Amendment in a moment. Insofar as Gillespie's equal protection claim is concerned, we need only note that we have twice rejected the contention that the right to possess a firearm is a fundamental one. *See United States v. Jester*, 139 F.3d 1168, 1171 (7th Cir.1998); *Sklar v. Byrne*, 727 F.2d 633, 637 (7th Cir.1984); *see also Lewis v. United States*, 445 U.S. at 66, 100 S.Ct. at 921. Judge Barker consequently did not err in declining to hold section 922(g)(9) to a more stringent test; the statute need only have a rational basis in order to satisfy the equal protection component of the Fifth Amendment's Due Process Clause. *See Jester*, 139 F.3d at 1171; *Sklar*, 727 F.2d at 637; *accord United States v. Smith*, 171 F.3d 617, 624 (8th Cir.1999).

 Like Gillespie, the defendant in *United States v. Lewitzke* suggested that it was irrational to impose a firearms disability solely upon those convicted of domestic violence misdemeanors, when other misdemeanor convictions might reflect just as much of a propensity to harm others. 176

F.3d 1022, 1025 (7th Cir.1999). We rejected that argument:

> Congress is free to "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *see also F.C.C. v. Beach Communications, Inc., supra*, 508 U.S. [307,] at 316, 113 S.Ct. [2096,] at 2102, 124 L.Ed.2d 211 [ (1993) ]. For a legislature concerned about the harm that may befall victims of domestic violence from firearms, persons already convicted of domestic violence are a logical starting, if not ending point.... [B]y definition, those convicted of domestic violence offenses have already harmed their domestic partners in some fashion. It certainly would not be irrational for Congress to conclude that these individuals pose the most acute danger of turning a gun on a family member.

*Lewitzke*, 176 F.3d at 1027. *See also Fraternal Order of Police*, 173 F.3d at 904; *National Ass'n of Gov't Employees*, 968 F.Supp. at 1573–75.

We likewise reject the notion that the firearms ban may be irrational to the extent it reaches individuals like Gillespie, who carry firearms in the public interest. That someone previously convicted of engaging in domestic violence may possess a firearm for public rather than private purposes does not negate the possibility that he might use that gun against someone in his household. Congress could, therefore, reasonably conclude that the reasons for an individual carrying a gun are irrelevant and that it is the individual's criminal history which should determine his right to do so.[11]

---

11. In his statement of the questions presented, Gillespie suggests that the statutory scheme may deny the equal protection rights of domestic violence misdemeanants because convicted felons are authorized to carry firearms in the public interest while misdemeanants are not. Gillespie Br. xi; *see* 18 U.S.C.

§ 925(a)(1). Gillespie's counsel pursued that same argument, initially with success, before the District of Columbia Circuit. *See Fraternal Order of Police v. United States*, 152 F.3d 998 (D.C.Cir.), *reh'g granted*, 159 F.3d 1362 (1998), *on reh'g*, 173 F.3d 898 (1999). Gillespie made no effort to develop this line of

**710**

## C.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The link that the amendment draws between the ability "to keep and bear Arms" and "[a] well regulated Militia" suggests that the right protected is limited, one that inures not to the individual but to the people collectively, its reach extending so far as is necessary to protect their common interest in protection by a militia. The Supreme Court's jurisprudence on the scope of this amendment is quite limited itself, and not entirely illuminating. Sixty years ago, however, it did reject a Second Amendment challenge to an indictment charging the defendants with the unlawful transport in interstate commerce of an unregistered, double-barrel, twelve-gauge Stevens shotgun with a barrel length of less than eighteen inches. *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). In the absence of "some reasonable relationship" between the gun and "the preservation or efficiency of a well regulated militia," the Court concluded, "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* at 178, 59 S.Ct. at 818. *See also Lewis*, 445 U.S. at 65 n. 8, 100 S.Ct. at 921 n. 8; *Konigsberg v. State Bar of Calif.*, 366 U.S. 36, 49 n. 10, 81 S.Ct. 997, 1006 n. 10, 6 L.Ed.2d 105 (1961); *Adams v. Williams*, 407 U.S. 143, 151–52, 92 S.Ct. 1921, 1925, 32 L.Ed.2d 612 (1972) (Douglas, J., dissenting); *Quilici v. Village of Morton Grove*, 695 F.2d 261, 270 (7th Cir.1982), *cert. denied*, 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983); *United States v.*

*Three Winchester 30–30 Caliber Lever Action Carbines*, 504 F.2d 1288, 1290 n. 5 (7th Cir.1974) (cited with approval by *Lewis*, 445 U.S. at 65 n. 8, 100 S.Ct. at 921 n. 8); *United States v. McCutcheon*, 446 F.2d 133, 135–36 (7th Cir.1971). Whatever questions remain unanswered, *Miller* and its progeny do confirm that the Second Amendment establishes no right to possess a firearm apart from the role possession of the gun might play in maintaining a state militia. *United States v. Wright*, 117 F.3d 1265, 1271–72 (11th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 584, 139 L.Ed.2d 422 (1997), *vacated in part on reh'g on other grounds*, 133 F.3d 1412 (11th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 217, 142 L.Ed.2d 178 (1998); *United States v. Hale*, 978 F.2d 1016, 1019–20 (8th Cir.1992), *cert. denied*, 507 U.S. 997, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993). As such, the United States reasons, the right protected by the Second Amendment is indeed a collective rather than an individual one, and for that reason Gillespie has no standing to attack the Gun Control Act on Second Amendment grounds. *See San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1124–25 (9th Cir.1996); *Hickman v. Block*, 81 F.3d 98, 102 (9th Cir.), *cert. denied*, 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996).

We believe that Gillespie may invoke the Second Amendment in his challenge to section 922(g)(9) for the same reasons that we concluded he has standing to invoke the Tenth Amendment. Simply put, the statute deprives him of the ability to possess a firearm and, consequently, has cost him his job as an Indianapolis police officer. If we were to conclude that the statute runs afoul of the Second Amendment, as Gillespie urges us to do, then the disability imposed by the statute would be

attack in the body of his brief, however, and has therefore waived the argument. *E.g., Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 n. 1 (7th Cir.1996). We do note that the D.C. Circuit has now retreated from its initial view that the statutory distinction between felons and misdemeanants is irrational. The court concluded on rehearing

that Congress could have rationally believed that existing laws and practices were sufficient to handle the potential problems raised by the issuance of firearms to felons employed by state and federal agencies but were insufficient insofar as misdemeanants were concerned. 173 F.3d at 903–04.

void, and Gillespie would regain the opportunity to carry a firearm and (presumably) his employment with the Indianapolis police force. In other words, he has suffered a cognizable injury as a result of the statute's enactment, and that injury is one that would be redressed through a favorable ruling on his Second Amendment challenge. His claim therefore meets the pragmatic test articulated by *Duke Power. See* 438 U.S. at 78–79, 98 S.Ct. at 2633–34. We are also satisfied that prudential concerns do not stand in the way of his claim. *See id.* at 80–81, 98 S.Ct. at 2634. Although the Second Amendment appears on its face to secure a collective right (in much the same way that the Tenth Amendment guards state sovereignty), the right is constitutionally preserved not as an end in itself but as a means of securing liberty—thus the textual reference to "the security of a *free* State." U.S. CONST. amend. II (emphasis ours). As a citizen of Indiana, we believe that Gillespie has standing to invoke a proviso aimed at preserving the State's security and freedom, notwithstanding the possibility that Indiana itself may have no objection to the statute under scrutiny. *See New York,* 505 U.S. at 181–82, 112 S.Ct. at 2431–32.[12]

 Although the limited nature of the right guaranteed by the Second Amendment may not deprive Gillespie of standing, it does foretell the outcome of his challenge. For Gillespie has not convinced us that he can demonstrate a "reasonable relationship" between his own inability to carry a firearm and "the preservation or efficiency of a well regulated militia." *Miller,* 307 U.S. at 178, 59 S.Ct. at 818. Yes, because Gillespie can no longer carry a gun, the Indianapolis Police Department has decided to fire him; and because he will no longer be a member of the Indianapolis police force, he will no longer be subject on *that* basis to the governor's call to serve in the Indiana militia. *But see Fraternal Order of Police,* 173 F.3d at 906. We shall also assume, as Gillespie suggests, that the state militia consequently will no longer have the benefit of the training and many years of service that Gillespie and others like him bring to the State when called to serve. But he does not argue (and we do not believe under any plausible set of facts that he could) that the viability and efficacy of state militias will be undermined by prohibiting those convicted of perpetrating domestic violence from possessing weapons in or affecting interstate commerce. *See id.; see also Wright,* 117 F.3d at 1273–74; *United States v. Rybar,* 103 F.3d 273, 286 (3d Cir.1996), *cert. denied,* ─── U.S. ───, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997). Because Gillespie has no reasonable prospect of being able to demonstrate such a nexus between the firearms disability imposed by the statute and the operation of state militias, Judge Barker was right to dismiss his Second Amendment claim.

---

**12.** Although our conclusion that Gillespie has standing to pursue a Second Amendment claim conflicts with the Ninth Circuit's holdings in *San Diego County Gun Rights Committee* and *Hickman,* we note that the great majority of precedents in this area have rejected Second Amendment challenges to firearms legislation on their merits and thus have implicitly rejected the notion that individuals lack standing to invoke the Second Amendment. *E.g., Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206; *United States v. Rybar,* 103 F.3d 273, 286 (3d Cir.1996), *cert. denied,* ─── U.S. ───, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997); *Love v. Pepersack,* 47 F.3d 120, 124 (4th Cir.), *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 27 (1995); *Quilici,* 695 F.2d at 270; *United States v. Oakes,* 564 F.2d 384, 387 (10th Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978); *United States v. Warin,* 530 F.2d 103, 106–07 (6th Cir.), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976). Although many of these challenges were made in the context of criminal prosecutions, where standing rules appear to be somewhat more relaxed, *see Wright,* 117 F.3d at 1274 n. 18 (citing *Morgan v. Virginia,* 328 U.S. 373, 375, 66 S.Ct. 1050, 1053, 90 L.Ed. 1317 (1946)), Second Amendment challenges have been raised and resolved on the merits in the civil context as well. *See, e.g., Thomas v. Members of City Council of Portland,* 730 F.2d 41, 42 (1st Cir.1984) (per curiam); *Quilici,* 695 F.2d at 270.

### III.

Finding no constitutional defect in section 922(g)(9), we affirm the dismissal of Gillespie's complaint.