In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-2569

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENNETH JAMES PRICE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 771—**James F. Holderman**, *Judge.*

ARGUED APRIL 17, 2003—DECIDED MAY 16, 2003

Before BAUER, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* You just know there's going to be a whole lot of trouble when a man, wearing a ski mask over his face, enters a bank on a hot August afternoon. And there was plenty of trouble back in August 2001 when a man behind a ski mask pointed a gun at Siamphay Mounivong, a teller at the Elgin State Bank in Elgin, Illinois, and said, "I need money." Mounivong opened her teller drawer and complied with what seemed pretty clearly to be an order. The robber was not satisfied and said, "I need more money," a request with which Mounivong also wisely complied, giving the robber a total of $8,300, $500 of which was bait money. The robber fled out the front door of the bank. After locking the door so the robber

could not return, Mounivong went to the branch manager to report the robbery. The manager, in the presence of another employee, was already on the phone with the police. Mounivong then described the mask, the gun, and the clothes the robber was wearing. That information, plus information that the robber was Hispanic, was passed on to the police, where it was dispatched to two officers in the area, Richard Ciganek and Jeff Wiltberger. In another dispatch, Ciganek heard additional information that the robber was a black man.

Within 2 minutes and 1,000 feet of the bank, the officers saw Kenneth Price, who is African-American, walking "at a brisk pace." He was wearing blue jeans and a long-sleeve blue shirt. He was carrying a "bulging sack," which upon later inspection turned out to be a blue ski mask stuffed with money—$8,300 to be exact, including the bait money. The officers stopped their squad car. As the car was pulling to a stop, Officer Ciganek got out and saw that Price had a gun tucked into his waistband. The officer could see "[t]he gun handle, it's on an angle. You could see the handle come up and just kind of sticking down." He said, "You could see the top part of the handle and maybe the butt end, back end." Price was ordered to the ground, where the gun was confiscated and he was handcuffed and arrested.

A few minutes later, other officers, who had gone to the bank, took Mounivong and another bank employee to the site where Price was in custody. On the way, the officers told Mounivong that they had the guy who did the robbery and they wanted her to see him. Given that hint, it is not surprising that Mounivong said "that's the shirt," "that's the color . . . for sure," and "that's the blue pants" that he wore. Neither bank employee was asked to identify Price's face.

It is probably also not surprising that Price was convicted of armed robbery, in violation of 18 U.S.C. § 2113(a)

and (d), of the use of a firearm in a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A), and, because he was a felon, of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

He appeals, contending that the police did not have a reasonable suspicion to stop him on the street. In other words, the original stop was not a proper stop, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). He also contends that the "show-up" at which Mounivong identified the clothing violated his Fifth Amendment due process rights. Finally, in what can only be described as a brash move, he contends that the felon in possession statute—18 U.S.C. § 922(g)(1)—violates the Second Amendment's protection of an individual's right to keep and bear arms.

None of these issues were raised in the trial court. For that reason, the government makes an impassioned plea that we need to find waiver—and not forfeiture—of these issues and, not only that, that we need to take this opportunity to draw some bright line rules regarding waiver so as to prevent, as was stated in a flight of fancy at argument, "havoc in the district courts." We're pretty sure that whatever havoc might exist in the district courts is not a result of our waiver-forfeiture decisions. In fact, on that point, we reaffirm our discussion in *United States v. Clarke*, 227 F.3d 874 (7th Cir. 2000).

In this case, it does not matter whether we find waiver, or forfeiture, or if, in fact, we were to find the issues properly preserved, which, of course, we do not. No matter how you turn it, this remains a valid conviction.

As to the *Terry* stop, the police "do not have to have *any* degree of reasonable suspicion in order to accost a person and say they want to talk to him." *United States v. DeBerry*, 76 F.3d 884, 885-86 (7th Cir. 1996). When, however, an officer restrains a person's "freedom to walk away," that person has been subjected to a *Terry* stop. In

a situation, like the one here, where officers see a gun upon approaching a person, they certainly have "reasonable suspicion" to restrain that person without violating *Terry*.

The "show-up," if it can be called that, at which Mounivong identified the clothing as those which the robber wore, is not, in itself, the source of the alleged error, nor could it be because the government did not on direct examination elicit testimony regarding the out-of-court identification of the clothing. It was the defense which introduced the out-of-court identification in an attempt to discredit Mounivong's testimony. The argument is that the out-of-court identification tainted her in-court identification of the clothing.

Assuming, for the sake of discussion, that this issue was forfeited, and not waived, we consider the issue for plain error. Error under this standard is reversible only if it is "plain," meaning clear under current law, and if it affects substantial rights, in that it must be prejudicial and must have affected the outcome of the district court proceedings. *United States v. Olano*, 507 U.S. 725, 734 (1993); *United States v. Williams*, 272 F.3d 845, 859 (7th Cir. 2001). Despite what the government acknowledges was a police misstep in telling Mounivong that they had caught the robber, given the totality of the circumstances Price cannot establish that the identification is unreliable under *Neil v. Biggers*, 409 U.S. 188 (1972). But above all, he cannot establish that the error affected his substantial rights—that the error affected the outcome of the trial.

It is almost impossible to imagine that without the identification of the clothing Price would have been acquitted. The jury would have learned that within 2 minutes and less than 1,000 feet from the bank while carrying a gun, and with the exact amount of money stolen (in-

cluding the bait money) stuffed into a ski mask, Price was arrested by the police. Price says yes, but there was some testimony from a passerby that as he left the bank the robber was dropping money. Price apparently contends that he could have simply picked up the money as he innocently walked along the street and then have had the misfortune to be caught with it; never mind that there was no testimony either from Price himself or from anyone regarding that possibility. Price's explanation of the lack of testimony is that he was precluded from testifying that he found the money because of the identification of his clothing. We can find no way to credit that explanation.

Finally, Price argues that the felon-in-possession statute is unconstitutional. A basic problem with this argument is that we have previously found that statute to be constitutional. *United States v. Three Winchester 30-30 Caliber Lever Action Carbines*, 504 F.2d 1288 (7th Cir. 1974) (dealing with a predecessor statute); *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999) (dealing with 922(g)(9) prohibiting those convicted of misdemeanor crimes of domestic violence from possessing firearms); and *United States v. Hemmings*, 258 F.3d 587 (7th Cir. 2001) (upholding 922(g)(1) and (9) in the face of a Second Amendment attack).

But, Price argues, a recent decision of the Court of Appeals for the Fifth Circuit—*United States v. Emerson*, 270 F.3d 203 (2001)—and a recent letter written by Attorney General John Ashcroft to the National Rifle Association provide us with reason to reexamine our position. We don't think so.

We, of course, would not be obliged to follow *Emerson*, even were it to lead to the conclusion Price urges. It is true that *Emerson* rejects what are known as the "collective rights" and "sophisticated collective rights" models

for interpreting the Second Amendment. In short, it adopts the individual rights model, which says that the amendment protects "individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms, such as the pistol involved here . . . ." At 260. In contrast, in our decision in *Gillespie*, we said that the rights under the Second Amendment inure "not to the individual but to the people collectively, its reach extending so far as is necessary to protect their common interest in protection by a militia." 185 at 710. But even were we inclined to, there is no need for us to wade into that Second Amendment quagmire because, although it espouses an individual rights approach to the Second Amendment, the *Emerson* court agrees with our conclusion that rights under the amendment can be restricted. Specifically, the court found that 18 U.S.C. § 922(g)(8) did not infringe Emerson's rights: "[I]t is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms." At 261.

Like the Court of Appeals for the Fifth Circuit, the Attorney General subscribes to an individual rights interpretation of the Second Amendment. In his letter to the executive director of the NRA, he says "[L]et me state unequivocally my view that the text and the original intent of the Second Amendment clearly protect the right of individuals to keep and bear firearms." He says "clearly," though his view, as the need for such a lengthy discussion in *Emerson* reveals, is also pretty clearly not self-evident. But even given his interpretation, Mr. Ashcroft also acknowledges in a footnote, as it would be hard responsibly to deny, that "[o]f course, the individual rights view of the Second Amendment dos [sic] not prohibit Congress from enacting laws restricting firearms ownership for compelling state interests, such as prohibiting firearms ownership by convicted felons . . . ." At least for

the moment, § 922(g) is safe with us and, in fact, is safe with the Attorney General and the Court of Appeals for the Fifth Circuit.

   The judgment of conviction is AFFIRMED.


A true Copy:

         Teste:

                        _____

                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*