LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS OF WISCONSIN, Red Cliff Band of Lake Superior Chippewa Indians and Sakaogon Chippewa Community (Mole Lake Band of Lake Superior Chippewa Indians), Plaintiffs,

v.

UNITED STATES of America, U.S. Department of the Interior, the Honorable Gale Norton, Secretary of the Department of the Interior, and James H. McDivitt, Deputy Assistant Secretary/Indian Affairs, Defendants,

and

James E. Doyle,[1] Governor of the State of Wisconsin, and the State of Wisconsin, Defendant–Intervenors.

No. 02–C–0533–C.

United States District Court, W.D. Wisconsin.

April 22, 2003.

1. Pursuant to Fed.R.Civ.P. 25(d)(1), Governor James E. Doyle has been substituted for his predecessor in office, Governor Scott McCallum.

S. Todd Farris, Friebert, Finerty & St. John, S.C., Milwaukee, WI, for Plaintiffs.

Leslie K. Herje, Assistant U.S. Attorney, Madison, WI, for USA.

Edward J. Passarelli, United States Dept. of Justice, Environment and Natural Resources, Washington, DC, for Department of Interior, James H. McDivitt, Gale Norton, and USA.

John S. Greene, Assistant Attorney General, Madison, WI, for Scott McCallum (Intervenor), and State of Wisconsin (Intervenor).

Tom Gede, Conf. of Western Atty. General, Sacramento, CA, for State of Nebraska.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for declaratory relief in which three Wisconsin Indian tribes, Lac Courte Oreilles Band of Lake Superior Chippewa, Red Cliff Band of Lake Superior Chippewa and Sakaogon Chippewa Community or Mole Lake Band of Lake Superior Chippewa, are challenging the constitutionality of the gubernatorial concurrence requirement in the Indian Gaming Regulatory Act, 25 U.S.C. § 2719(b)(1)(A). Plaintiffs contend that Congress's inclusion of such a provision is an unconstitutional delegation of power, or, alternatively, that it violates the appointments clause, Art. II, § 2; the Tenth Amendment; and the Fifth Amendment equal protection clause. Plaintiffs raise a common law claim as well, contending that the gubernatorial concurrence requirement is a congressional breach of trust.

The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, represents Congress's attempt to balance the competing interests of Indians, states and the federal government in the conduct of gaming activities on Indian lands. The resulting legislation is intended to promote tribal economic development, self-sufficiency and strong tribal government, § 2702(1), and to provide clear standards for the regulation of gaming, § 2702(2). The basic framework of the law is the division of Indian gaming into three classes. Class I games are social or traditional games played in connection with tribal ceremonies or celebrations over which the tribes have exclusive regulatory authority. Class II games include bingo-related and card games. Tribes may conduct these games and offer them to the public, if the state in which the tribal lands are located permits such gaming for any purpose. Class III games include all gaming not included in the other two classes, such as casino-type games, parimutuel betting and lotteries.

Tribes may offer these games only if (1) such gaming is authorized by a tribal ordinance approved by the chair of a commission that is established by the Act; (2) it is located in a state that permits such gaming; and (3) it is conducted in conformity with a tribal-state compact, negotiated by the tribe with the governor of the state. 25 U.S.C. § 2703.

Congress did not limit all gaming to existing Indian lands. It provided a mechanism for tribes to offer gaming on land that they did not own as of 1988, when the Gaming Regulatory Act became effective. 25 U.S.C. § 2719. The statute prohibits all gaming on such land, with certain exceptions. Under the one relevant to this case, the Secretary of the Interior may reach a determination that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members and would not be detrimental to the surrounding community. Before making such a determination, the Secretary must consult with the Indian tribe and appropriate state and local officials, including officials of other nearby Indian tribes. In addition, "the Governor of the State in which the gaming is to be conducted [must concur] in the Secretary's determination." 25 U.S.C. § 2719(b)(1)(A).

It is this concurrence requirement that plaintiffs are challenging as unconstitutional and a breach of trust. The case is before the court on (1) plaintiffs', defendants' and defendant-intervenors' cross-motions for judgment on the pleadings; and (2) plaintiffs' "conditional" motion to amend their complaint. The states of Alabama, California, Colorado, Connecticut, Florida, Illinois, Iowa, Kansas, Louisiana, Minnesota, Michigan, Nebraska, Nevada, New Jersey, New Mexico, Oregon, South Dakota, Texas, Vermont, Washington and Wyoming have filed a joint amicus curiae

brief in opposition to plaintiffs' motion for judgment on the pleadings.

I conclude that the gubernatorial concurrence of the Indian Gaming Regulatory Act does not violate the non-delegation doctrine because the legislation expresses the will of Congress and provides an intelligible principle by which it can be determined that it is Congress's will that is being carried out; it does not violate the appointments clause because it does not diffuse executive power; and it does not conscript governors into federal service in violation of the Tenth Amendment. Therefore, the provision does not violate the Constitution. (Plaintiffs have not pursued their contention that the legislation violates the equal protection clause of the Fifth Amendment.) It is not a congressional breach of trust because it was enacted by Congress pursuant to the federal government's plenary powers over Indians. Furthermore, plaintiffs cannot challenge the alleged breach of trust because such a suit would be barred by the government's sovereign immunity.

I will grant defendants' and defendant-intervenors' motions for judgment on the pleadings and deny plaintiffs' motion for judgment on the pleadings. I will deny plaintiffs' conditional motion to amend the complaint. The motion is untimely and probably futile.

The parties agree that there are no disputed facts and that the motions can be decided as a matter of law.

## BACKGROUND

In October 1993, plaintiffs submitted an application to the Secretary of the Interior, asking that the federal government take certain land into trust for them, as the Secretary is authorized to do under the Indian Reorganization Act of 1934, 25 U.S.C. § 465. Plaintiffs sought to establish an off-reservation gaming casino at an existing greyhound racing facility in Hudson, Wisconsin.

On July 14, 1995, the Secretary rejected plaintiffs' application. Plaintiffs objected to the Secretary's rejection and filed suit in this court, see Sokaogon Chippewa Community v. Babbitt, 961 F.Supp. 1276 (W.D.Wis.1997) (bands made sufficiently strong showing of improper influence on agency decision to be entitled to extra-record discovery and examination of agency personnel). While portions of the lawsuit were still pending and after congressional investigations and hearings, the parties settled their dispute on October 8, 1999. As part of the settlement agreement, the Secretary vacated the July 14 rejection and agreed to resume consideration of plaintiffs' application.

On February 20, 2001, the Secretary determined that plaintiffs' proposal to conduct gaming on lands to be acquired in trust was in the best interest of the Indian tribes and would not be detrimental to the surrounding community. See 25 U.S.C. § 2719(b)(1)(A). On May 11, 2001, one day after plaintiffs filed this lawsuit, then-Governor Scott McCallum formally advised the Secretary of his non-concurrence with her determination. See id. On June 13, 2001, the Secretary denied plaintiffs' application and invited plaintiffs to re-apply to acquire the subject land in trust for non-gaming purposes.

## OPINION

### A. Breach of Trust Claim

The bulk of plaintiffs' challenge to 25 U.S.C. § 2719 rests on constitutional grounds. Therefore, I will begin with their one non-constitutional claim, which is grounded on a common law breach of trust. See Clinton v. Jones, 520 U.S. 681, 690 n. 11, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (" 'If there is one doctrine more

deeply rooted than any other in the process of constitutional adjudication, it is that [courts] ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.'") (quoting *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944)). Defendants contend that no examination of this claim is necessary or even permissible because the federal government's sovereign immunity bars plaintiffs from suing on this common law claim. In order to decide whether defendants are correct, it is necessary to determine the nature of plaintiffs' breach of trust claim. Therefore, I will start with a discussion of the claim and then take up the sovereign immunity defense.

Plaintiffs' breach of trust claim rests on the premises that (1) the federal government has underlying trust obligations to the Indians; (2) Congress cannot undermine those obligations to the Indians by claiming to be exercising its general powers when it is actually acting pursuant to its trust obligations; (3) even when Congress is exercising plenary powers over Indians, the courts have the authority to review any legislation to insure that it does not breach the government's trust obligations; and (4) in reviewing such legislation, courts can uphold it only if it is tied rationally to the fulfillment of Congress's unique obligations toward Indians. As it relates to this case, plaintiffs assert that Congress was acting in its role as a trustee when it enacted the gaming regulation at issue and that it violated its trust obligations to the Indians when it made the approval of gaming on after-acquired lands subject to the concurrence of a state governor.

It is true that the relationship between the United States and Indian tribes has been said to resemble that of guardian and ward, *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831); *United States v. Mitchell (Mitchell II)*, 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (referring to "undisputed existence of a general trust relationship between the United States and the Indian people"). Many statutes establish specific fiduciary duties for the federal government in relation to Indian tribes. *See, e.g., United States v. White Mountain Apache Tribe*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (statute providing that former military post to be "held by the United States" in trust for tribe); *Mitchell II*, 463 U.S. 206, 103 S.Ct. 2961, (25 U.S.C. § 406(a) gives Secretary of Interior broad statutory authority to manage and sell reservation timber upon consideration of "the needs and best interests of the Indian owner and his heirs"; statute created fiduciary duty requiring compensation for damages sustained from Secretary's breach of duties); *cf. United States v. Mitchell (Mitchell I)*, 445 U.S. 535, 542, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (Indian General Allotment Act of 1887, 25 U.S.C. §§ 331–338, created only limited trust relationship between federal government and Indian allottee that did not "impose any duty upon the Government to manage timber resources"). However, plaintiffs are not arguing either that the Indian Gaming Regulatory Act imposes fiduciary duties on the federal government or that individual defendants Norton and McDevitt failed to carry out a fiduciary duty imposed on them by the Act. Their argument is a different one: the government's general fiduciary duty to the tribes requires it to legislate in the interests of the tribes and of their sovereignty in every instance. The corollary of their argument is that the courts have the authority to review all Indian legislation to insure that it meets this standard.

As plaintiffs admit, Plts.' Reply Br., dkt. # 22, at 33 n. 15, no court has ever invalidated a statute on the basis of the trust

doctrine. However strong the arguments for holding the government to its stated fiduciary responsibilities or to giving the same kind of deference to the sovereignty of tribes as to that of states, *see, e.g.,* Brad Jolly, *The Indian Gaming Regulatory Act: The Unwavering Policy of Termination Continues,* 29 Ariz. St. L.J. 273 (1997); materials cited in *Red Lake Band of Chippewa Indians v. Swimmer,* 740 F.Supp. 9, 11–12 (D.D.C.1990), the Supreme Court has held that the federal government has almost unlimited authority over Indian tribes. It may abrogate treaties and divest the tribes of their sovereignty. *See, e.g., United States v. Sioux Nation of Indians,* 448 U.S. 371, 410–11 and n. 11, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980) (Congress has power to abrogate treaties with Indians); *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance").

In *Sioux Nation,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844, the Supreme Court discussed two lines of cases involving the government's power over Indian property: those in which the United States is acting as trustee for the tribes, exercising its plenary powers over them and their property, "as it thinks is in their best interests," *id.* at 408, 100 S.Ct. 2716, and those in which it is exercising its power of eminent domain, taking Indian property within the meaning of the Fifth Amendment. *Id.* (citing *Three Affiliated Tribes of Fort Berthold Reservation v. United States,* 182 Ct.Cl. 543, 390 F.2d 686, 691 (1968)). In the former case, the question for the courts is whether the government has acted as a proper trustee: Did it exchange assets for other assets of equal value? In the latter case, the question is whether the government effected a taking and, if so, what the Fifth Amendment requires in the way of compensation for the taking. Neither situation is at issue in this case.

Plaintiffs' challenge to the Indian Gaming Regulatory Act does not focus on the government's handling of tribal property but on the government's power to enact general legislation that intrudes on the tribes' sovereignty.

■ Plaintiffs acknowledge that Congress has the authority to enact general legislation that applies to Indians, Plts.' Br., dkt. # 4, at 30 ("trust relationship does not insulate tribes from the reach of Congress' general legislative powers"), but they assert that when Congress enacted the gaming act, it did so pursuant to its trust obligations, not its general legislative powers. Plaintiffs do not back up this assertion with any statutory language or legislative history and they do not explain away the case law to the contrary. *See, e.g., Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 47–48, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("Congress passed the Indian Gaming Regulatory Act in 1988 in order to provide a statutory basis of the operation and regulation of gaming by Indian tribes" and did so pursuant to its powers under Indian commerce clause, U.S. Const., art. I, § 8, cl. 3); *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989) ("central function of the Indian Commerce Clause is to provide Congress with the plenary power to legislate in the field of Indian affairs"). When Congress legislates under this clause, the courts' reviewing authority is limited to determining the constitutionality of the legislation, as in *Seminole Tribe* (holding unconstitutional provision allowing suits against states or state officials for failure to negotiate compacts under gaming act as violative of Eleventh Amendment). It does not extend to reviewing the extent to which the legislation carries out the government's general trust duties to the tribes.

In addition to arguing that the government has a continuing trust duty to Indian tribes when it regulates any Indian activity, plaintiffs rely on the Indian Reorganization Act of 1934, 25 U.S.C. § 465, which provides that lands acquired are "taken in the name of the United States in trust for the Indian tribe." The reason for plaintiffs' reliance is unclear. The statute does not apply to plaintiffs because the United States has not acquired the land at issue in trust. Even if it did apply, it imposes no specified fiduciary duties upon the United States. In that respect, it is like the General Allotment Act, which the Supreme Court has found creates only a limited trust without fiduciary duties. *Mitchell I,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607. *See also Thomas v. United States,* 141 F.Supp.2d 1185, 1205 (W.D.Wis.2001) (court not persuaded "that § 476 of the Indian Reorganization Act imposes fiduciary obligations on the United States as a trustee").

Plaintiffs argue that the Indian Gaming Regulatory Act provides for extensive federal oversight and control of gaming on Indian land. Therefore, they assert, the Act is equivalent to the regulations in *Mitchell II* and gives rise to a fiduciary duty. Again, plaintiffs' argument fails because the United States never acquired the subject land in trust for plaintiffs. Without a trust, there is no fiduciary duty. Even setting this logical infirmity aside, the Act itself does not create a fiduciary duty; it is a regulatory scheme that balances the competing interests of the states, the federal government and Indian tribes.

Congress enacted the gaming act in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), holding that Public Law 280 states such as California had no authority to apply their gambling laws to Indian gaming. Under Pub.L. 280, Congress gave six states, including California and Wisconsin, jurisdiction over specified areas of Indian country within the states. *Id.* at 207, 107 S.Ct. 1083. The states have broad criminal jurisdiction over offenses committed by or against Indians within all Indian country and jurisdiction over private civil litigation involving reservation Indians in state court, but no general civil regulatory authority. *Id.* at 207–08, 107 S.Ct. 1083. California allowed many forms of gaming activities on non-reservation lands; therefore, the state "regulated" rather than "prohibited" such activities. Because states lack the authority to enforce civil regulatory laws on Indian lands and because Congress had not made state gambling laws applicable to Indian country, California had no jurisdiction over gaming on the Cabazon Band's lands. The Court noted that Congress could give states jurisdiction over Indian gaming, *id.* at 207, 107 S.Ct. 1083 ("state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided"), but made it clear that without congressional action, the states would have no way to prevent or regulate Indian gaming. *See* S.Rep. No. 100–446, at 2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071–72; *see also Confederated Tribes of Siletz Indians of Oregon v. United States,* 110 F.3d 688, 692 (9th Cir.1997). Heeding this statement, Congress passed the Indian Gaming Regulatory Act, identifying its purposes as being:

> (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;
>
> (2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the pri-

mary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702.

█ Nothing in the Act indicates any intention by Congress to recognize or create a fiduciary duty. The Act does not create a situation in which the federal government holds resources in trust for the Indians. *See Vizenor v. Babbitt,* 927 F.Supp. 1193, 1201 (D.Minn.1996) ("no fiduciary duty created by [Indian Gaming Regulatory Act's] elaborate regulatory scheme"); *Pueblo of Santa Ana v. Kelly,* 932 F.Supp. 1284, 1297 (D.N.M.1996) (Indian Gaming Regulatory Act "does not in itself ... impose duties upon the United States such as those applicable to private trustees").

█ I conclude that plaintiffs cannot prevail on their claim that the United States breached any common law fiduciary duty to them when Congress passed the Indian Gaming Regulatory Act. Plaintiffs' only other claims are constitutional in nature. Defendants do not deny that the United States has waived its sovereign immunity as to such claims. *See Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690–91, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) (when "statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional," sovereign immunity does not prevent suit for declaratory relief against federal officer); *see also Clark v.*

*United States,* 691 F.2d 837, 841 (7th Cir. 1982) (request for declaratory judgment that federal statute is unconstitutional "does not impose an intolerable burden on governmental functions" and is not barred by sovereign immunity). Although I have concluded that plaintiffs' non-constitutional claim has no merit, I will address defendants' claim that it would be barred in any event by the federal government's sovereign immunity. As a sovereign, the United States cannot be sued without the consent of Congress. "Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity ... together with a claim falling within the terms of the waiver." *White Mountain Apache Tribe,* 537 U.S. at —— – ——, 123 S.Ct. at 1131–32; *see also United States v. Nordic Village, Inc.,* 503 U.S. 30, 33–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (statute must contain unequivocal waiver of immunity to permit suit against federal government).

In the Indian Tucker Act, 28 U.S.C. § 1505, Congress waived its sovereign immunity as to claims for money damages arising out of the federal government's breach of a statutory trust responsibility. Plaintiffs have no claim under this act, because they cannot prove a statutory breach of trust and they are not asking for money damages. The Administrative Procedure Act, 5 U.S.C. §§ 701–706, waives sovereign immunity for claims based on final *agency* actions. It is inapplicable because plaintiffs are challenging a legislative action rather than an agency action. *See* 5 U.S.C. § 701(b)(1) ("agency" does not include "Congress").

Plaintiffs raise one additional argument that is related to their breach of trust argument but independent of it. Citing *Littlewolf v. Lujan,* 877 F.2d 1058 (D.C.Cir.1989), plaintiffs contend that federal courts have the authority to review

legislation that Congress enacts pursuant to its plenary power over Indian affairs to insure that the legislation does not breach Congress's trust obligations. *See id.* at 1063 (Congress's power is " 'subject to limitations inhering in ... a guardianship and to pertinent constitutional restrictions' ") (citing *Sioux Nation,* 448 U.S. at 415, 100 S.Ct. 2716) (quoting *United States v. Creek Nation,* 295 U.S. 103, 109–10, 55 S.Ct. 681, 79 L.Ed. 1331 (1935)). *Littlewolf* does not help plaintiffs' argument that their common law claim is not barred by sovereign immunity. The case involved a constitutional issue: whether certain legislation deprived Indians of their property interests without due process and effected a taking without just compensation. *Id.* at 1060.

Despite plaintiffs' concession that their breach of trust claim is not a constitutional one, they drift into the constitutional arena when they argue that all Indian legislation must be tied rationally to the fulfillment of Congress's unique obligation to the Indians. The "rational tie" argument comes from *Delaware Tribal Business Committee v. Weeks,* 430 U.S. 73, 85, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977), where the Court used it in connection with a constitutional claim that certain Indian legislation violated equal protection and the just compensation clause under the Fifth Amendment. *Id.* at 85–90, 97 S.Ct. 911 (exclusion of Kansas Delaware Indian tribe from distribution of funds authorized by Congress to redress United States' breach of an 1854 treaty held not to violate equal protection under due process clause of Fifth Amendment). With one exception, plaintiffs have not cited any case in which a court reviewed legislation for a rational tie to Congress's trust obligations to the Indians when the legislation was not alleged to be unconstitutional. *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), which plaintiffs cite, is another equal protection case in which the Court

hold that an employment preference for Indians did not violate the due process clause of the Fifth Amendment. In fact, all of the cases cited by plaintiffs in opposition to defendants' sovereign immunity defense involve either a claim that a federal official has acted improperly in contravention of a controlling statute (a final agency action) or a claim that the government has effected an improper deprivation of property or violated equal protection (a constitutional violation). None involve a breach of trust arising out of the enactment of a statute.

Plaintiffs have cited only one case in which a court allowed a tribe to challenge an act as violative of Congress's federal trust responsibility to the Indians. In *Swimmer,* 740 F.Supp. 9, the court read *Delaware Tribal Business Committee,* 430 U.S. 73, 97 S.Ct. 911, 51 L.Ed.2d 173, *Littlewolf,* 877 F.2d 1058, the *Mitchell* cases, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 and 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607, and a decision by the Court of Appeals for the District of Columbia in *North Slope Borough v. Andrus,* 642 F.2d 589 (D.C.Cir.1980), as permitting the Red Lake Band to sue the federal government on a claim seeking declaratory and injunctive relief for Congress's alleged violation of its special obligation to the Indians in passing the Indian Gaming Regulatory Act. *Id.* at 12–13. The court did not discuss the differences that might exist between bringing a challenge to an agency action concerning the handling of Indian property, as in *Mitchell,* or on a violation of the Constitution, as in *Littlewolf* and *Delaware,* and bringing a challenge to the gaming act that was based neither on the handling of property or an alleged constitutional violation. This deprives the case of any persuasive force. In fact, *Swimmer* seems to be an anomaly; it was not appealed and it has never been cited by any other court.

Plaintiffs have not shown any reason for finding that the United States has waived its sovereign immunity as to the common law breach of trust claim that they alleged and they have failed to show that such a claim would be viable. Therefore, as to this claim, their motion for judgment on the pleadings will be denied and defendants' and defendant-intervenors' motion will be granted.

### B. *Constitutional Claims*

#### 1. *Delegation doctrine*

Plaintiffs argue that the gubernatorial concurrence in the Indian Gaming Regulatory Act violates the delegation doctrine in two different ways. It impermissibly assigns the function of acquiring land for gaming in trust for the Indians from the executive branch to state governors and it delegates authority to state governors without providing an intelligible principle to guide the governors' exercise of the delegated discretion. Defendants maintain that plaintiffs are wrong because (1) Congress has not usurped the executive branch's power for itself but rather delegated power to the state governor, a person not within the federal structure and (2) the gubernatorial concurrence constitutes "contingent legislation" and for this reason raises no delegation or separation of powers question.

Plaintiffs' first delegation argument rests upon *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), the case in which the Supreme Court overturned the provision of the Brady Act requiring the chief law enforcement officer of each local jurisdiction to perform background checks on prospective handgun purchasers and perform certain other tasks on an interim basis until the national system became operative. The Court rested its decision on two grounds: the division of power between the state and federal governments and the separation of powers among the three branches of the

federal government. In the first instance, commandeering local law enforcement officers to carry out congressionally directed tasks would violate the Tenth Amendment. In the second instance, the commandeering of local law enforcement officers to carry out Congress's legislative initiatives would undermine the power of the executive branch of the federal government, which under the Constitution has the authority to administer the laws that Congress enacts. *Id.* at 922, 117 S.Ct. 2365.

■ The first *Printz* argument is best reserved for the discussion of plaintiffs' Tenth Amendment claim. The second requires little discussion. Although plaintiffs argue that the governors' concurrence provision transfers responsibility to fifty state governors "who are left to implement the program without meaningful Presidential control," *Printz,* 521 U.S. at 922, 117 S.Ct. 2365, and is therefore exactly like the Brady Act provision overturned in *Printz,* their argument does not stand up to examination. In giving a say to the governors of states in which the Secretary of the Interior is considering taking lands in trust for Indian gaming, Congress was not giving state officials authority to execute congressional legislation, as in *Printz.* It was doing nothing more than giving the governors an opportunity to be heard on matters that affected the interests of their citizens, if they so chose.

I turn next to the second delegation of powers argument, that Congress cannot convey its lawmaking function to others. *See Loving v. United States,* 517 U.S. 748, 758, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ("The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, U.S. Const., art. I, § 1, and may not be conveyed to another branch or entity.") Chief Justice Rehnquist has described the doctrine as one that (1) requires Congress to make the

important choices of social policy; (2) guarantees that when Congress does delegate authority, "it provides the recipient of that authority with an 'intelligible principle' to guide the exercise of the delegated discretion," *Industrial Union Dept. v. American Petroleum Inst.*, 448 U.S. 607, 685–86, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)) (Rehnquist, J., concurring); and (3) gives reviewing courts ascertainable standards for testing the legitimacy of the delegated discretion. *Id.* As I have noted, defendants view the governors' concurrence provision as valid contingent legislation.

Certainly, contingent legislation is not unusual. Congress uses such legislation in many instances in which it cannot determine exactly when its exercise of legislative power should take effect. *See, e.g., Hampton*, 276 U.S. at 401, 48 S.Ct. 348 (upholding Congress's decision to give President authority to increase or decrease duties in order to equalize the difference between the cost of producing goods domestically and abroad). Congress can let other entities decide when the legislation should take effect, such as the executive branch, as in *Hampton*, or the tobacco growers in a certain area, as in *Currin v. Wallace*, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939). Although in such instances, one might say that others are exercising legislative power, "it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the Constitution." *Hampton*, 276 U.S. at 407, 48 S.Ct. 348. The Court has distinguished between " 'the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law.' " *Id.* at 407, 48 S.Ct. 348 (quoting *Cincinnati, W. & Z. Ry. Co. v. Com-*

*missioners of Clinton County*, 1 Ohio St. 77, 88–89 (1852)). Congress cannot do the former but " 'to the latter no valid objection can be made.' " *Id. See Field v. Clark*, 143 U.S. 649, 694, 12 S.Ct. 495, 36 L.Ed. 294 (1892):

> Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law.

(Internal quotation omitted).

The Supreme Court has upheld a number of instances of contingent legislation. For example, it affirmed the constitutionality of the Tobacco Inspection Act, 7 U.S.C. § 511(d), which allowed the Secretary of Agriculture to designate certain tobacco auctions as interstate tobacco markets, contingent on the concurrence of at least two-thirds of the affected farmers, *Currin*, 306 U.S. at 15, 59 S.Ct. 379 (noting that "it [was] Congress that exercise[d] its legislative authority in making the regulation and in prescribing the conditions of its application"), and it approved legislation authorizing the Secretary of Agriculture to define milk marketing areas and propose marketing orders that could go into effect only if two-thirds of those affected approved. *United States v. Rock Royal Co-op, Inc.*, 307 U.S. 533, 577–78, 59 S.Ct. 993, 83 L.Ed. 1446 (1939).

Plaintiffs argue that the gubernatorial concurrence is not permissible contingent legislation like that in *Hampton* and *Currin* but rather an impermissible delegation of power closer to that found in *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In fact, *Chadha* is not at all similar. *Chadha* involved Congress's attempt to give itself a one-house legisla-

tive veto over deportation decisions made by the Attorney General of the United States. In overturning the statute, the Supreme Court held that the effort "had the purpose and effect of altering the legal rights, duties, and relations of persons, including the Attorney General, Executive Branch officials and Chadha, all outside the Legislative Branch." *Id.* at 952, 103 S.Ct. 2764. Congress could take such an action only by passage of legislation in both chambers and presentment to the President. Neither house of Congress had the power to require the Attorney General to deport an alien once the Attorney General had made a contrary determination in the exercise of legislatively delegated authority. In *Chadha,* the Court was not concerned with the legitimacy of the delegation that Congress had made to the Attorney General but with the legitimacy of Congress's attempt to overrule the decisions the Attorney General made in the course of carrying out the delegated tasks. As a consequence, the case has little relevance to plaintiffs' challenge to the Indian Gaming Regulatory Act.

Moving on to a different but no more persuasive argument, plaintiffs contend that the gubernatorial concurrence provision is not permissible contingent legislation because it does not contain an intelligible principle or standards to enable reviewing courts to determine whether it is the will of Congress that is being carried out or that of another person or entity. Plaintiffs' argument focuses incorrectly on the nature of the concurrence rather than on 25 U.S.C. § 2719's explicit provision that gaming shall *not* be conducted on after-acquired lands *unless* certain conditions have been met, one of which is the governor's concurrence. The statute fixes the limits of delegation "according to common sense and the inherent necessities of the governmental co-ordination." *Hampton,* 276 U.S. at 406, 48 S.Ct. 348. Congress has exer-

cised its legislative authority by requiring the governor to concur in the Secretary's decision. It has prescribed the conditions that must be met before the general prohibition against gaming is lifted. *See Confederated Tribes of Siletz Indians v. United States,* 110 F.3d 688, 695 (9th Cir.1997) (gubernatorial concurrence in Indian Gaming Regulatory Act is permissible contingent legislation); *United States v. Ferry County,* 511 F.Supp. 546, 552 (E.D.Wash.1981) (upholding statute allowing Secretary of Interior to acquire land in trust for Indian tribe only if local county officials consented).

Plaintiffs fail to distinguish in any meaningful manner between the permissible contingency of two-thirds of the affected farmers in *Currin* and the gubernatorial concurrence in this case. In *Currin,* the statute provided that "[n]o market or group of markets shall be designated by the Secretary unless two-thirds of the growers voting favor it." *Id.* at 15, 59 S.Ct. 379. In this case, the statute provides that no gaming shall occur unless the Secretary makes a two-part determination and the governor concurs in that determination. 25 U.S.C. § 2719. Plaintiffs concede that this case would be analogous to *Currin* if § 2719 were contingent on a majority vote of the members of the applicant Indian tribes rather than a gubernatorial concurrence, without explaining how a two-thirds vote by the applicant Indian members would provide the standards that the gubernatorial concurrence lacks.

Plaintiffs argue that the *Currin* and *Rock Royal* line of cases is not relevant because those cases involved a vote of those to be regulated as opposed to a vote that permits one group to determine the law to be applied to another. They cite *Carter v. Carter Coal Co.,* 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), for the proposition that Congress violates the

Constitution when it enacts legislation allowing one group to impose a law upon members of another group. *Carter* affords plaintiffs little help; it was a due process case in which the affected interests were constitutionally protected and the persons given the power to set maximum hours of labor and minimum wages for the entire coal industry. It is worth noting that the persons exercising the authority were private persons, although the delegation of powers discussion was not the basis for the Court's holding. The legislation at issue in *Carter* is nothing like the gubernatorial concurrence provision in the gaming act. A state's governor is not a private person imposing a law upon others; he or she is a state official representing the interests of all the state's citizens, including the members of Indian tribes. If Congress may delegate to tribal officials the power to regulate distribution of alcoholic beverages on reservation lands owned by non-members of the tribe, *United States v. Mazurie*, 419 U.S. 544, 554, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), it may condition legislation on the concurrence of a governor without violating the separation of powers doctrine.

## 2. *Appointments clause*

In an argument closely related to the delegation doctrine and also embedded in the principle of separation of powers, plaintiffs contend that the gubernatorial concurrence violates the appointments clause, U.S. Const. art. II, § 2, cl. 2, which gives the President authority to appoint "all ... Officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by Law." The courts have read this provision as permitting only persons who are "Officers of the United States" to discharge functions properly discharged by officers. *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 757 (9th Cir.1993) (qui tam relators did not have so much

governmental power that they required appointment in conformity with appointments clause). The Supreme Court has held that the appointments clause serves as a guard against one branch's aggrandizement of its power at the expense of another branch and preserves constitutional integrity by preventing the diffusion of the appointment power. *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 878, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991).

■ The appointments clause applies to (1) all executive or administrative officers; (2) who serve pursuant to federal law; and (3) who exercise significant authority over federal government actions. *Buckley v. Valeo*, 424 U.S. 1, 123–27 & n. 162, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *see also Seattle Master Builders v. Pacific Northwest Electric Power & Conservation*, 786 F.2d 1359, 1365 (9th Cir.1986). Unless all three prongs of the *Buckley* test are met, there is no violation of the appointments clause. *Seattle Master*, 786 F.2d at 1365.

■ The governor of Wisconsin was never appointed as a federal officer and he is not one in fact. His failure to concur in the Secretary's determination violated the appointments clause only if he was exercising significant authority *pursuant to the laws of the United States*, *Buckley*, 424 U.S. at 126, 96 S.Ct. 612, and he was vested with responsibility for vindicating public rights, *id.* at 140, 96 S.Ct. 612. Looking at the factors the court of appeals identified in *Confederated Tribes*, 110 F.3d at 697, I agree with that court that the authority a governor exercises under § 2719 is neither significant enough to require appointment as a federal officer nor exercised pursuant to the laws of the United States. The governor does not have the sole authority to enforce the Indian Gaming Regulatory Act; he or she concurs in or rejects a gaming proposal only on an

episodic and infrequent basis; the Secretary of the Interior determines the federal interest in the project; and the governor has no power to require the Secretary to take land for gaming purposes. *Id.* Moreover, when the governor decides whether to concur or not, the governor is acting as a state official, performing a function that devolves on him only because of his state office: the determination of the state's position in relation to the Secretary's proposal to acquire lands for Indian gaming. *Id.*

In *Buckley,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, by contrast, the Court was considering the roles of the members of the Federal Election Commission, which had "primary and substantial responsibility for administering and enforcing the [Federal Election Campaign] Act," recordkeeping, disclosure, investigative functions and extensive rule making and adjudicative powers. *Id.* at 110, 96 S.Ct. 612. In fact, the Act allowed the commission to "formulate general policy" and gave it "primary jurisdiction with respect to ... civil enforcement." *Id.* The Supreme Court found the Commission's enforcement authority to be "both direct and wide ranging." *Id.* at 111, 96 S.Ct. 612.

*Seattle Master Builders,* 786 F.2d at 1362, supports defendants' argument that there is no comparison between the governor's narrow and episodic role under § 2719 and the Federal Election Commission's sweeping responsibility under the Federal Election Campaign Act. In that case, the petitioners challenged the creation of a regional energy conservation council that had certain authority over the Bonneville Power Administration, an agency of the federal government. The petitioners contended that the existence of the council violated the appointments clause because its members exercised significant authority over the federal government and were not appointed by the President. *Id.* at 1362–63. The Court of Appeals for the

Ninth Circuit disagreed, holding that the council members were not officers subject to the appointments clause, but rather served under state law. *Id.* at 1365. The court noted that "the states ultimately empower the Council members to carry out their duties ... [their] appointment, salaries and direction ... are state-derived." *Id.* at 1365. It concluded that *"Buckley* is about maintaining the separation of powers within the federal government.... Because Congress neither appoints nor removes the members of this Council, the balance of powers between Congress and the President is unaffected." *See also United States v. Germaine,* .99 U.S. 508, 512, 25 L.Ed. 482 (1878) (finding surgeon appointed by pension commissioner not subject to appointments clause because his job's tenure, duration, emolument and duties were only occasional and temporary).

### 3. *Tenth Amendment*

██ As a preliminary matter, defendants dispute whether plaintiffs have standing to bring a claim that the gubernatorial concurrence provision conscripts state governors into federal service in violation of the Tenth Amendment. Because the question of standing is a somewhat murky one in this circuit and is immaterial given the lack of merit in the substantive claim, I will not address it. (The murkiness arises from the conflict between the Supreme Court's holding in *Tennessee Electric Power Co. v. Tennessee Valley Authority,* 306 U.S. 118, 144, 59 S.Ct. 366, 83 L.Ed. 543 (1939), that private corporations have no standing to assert their states' sovereign rights, and the Court of Appeals for the Seventh Circuit's decision in *Gillespie v. City of Indianapolis,* 185 . F.3d 693, 700–03 (7th Cir.1999), that a city police officer could raise a Tenth Amendment challenge to a federal statute prohibiting him from carrying a firearm because

of his previous conviction of misdemeanor domestic abuse. Defendants argue that *Tennessee Electric Power* has never been withdrawn or overruled and that I must follow it and disregard *Gillespie*. They forget that, as a district court judge, I am bound by the court of appeals' interpretation of *Tennessee Electric*. *See Donohoe v. Consolidated Operating & Production Corp.*, 30 F.3d 907, 910 (7th Cir.1994) (judges of inferior courts must carry out decisions of superior courts).)

■ The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. As is evident, the Tenth Amendment does not itself demarcate the boundary between state and federal authority. *See New York v. United States*, 505 U.S. 144, 156–57, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("The Tenth Amendment ... is essentially a tautology."). Even when exercising one of its enumerated powers, Congress can run afoul of the Tenth Amendment by commandeering or conscripting state officials to carry out federal mandates. *See id.; Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). In other words, Congress may neither "compel the States to enact or administer a federal regulatory program," *New York*, 505 U.S. at 188, 112 S.Ct. 2408, nor "conscript the State's officers directly" by assigning to them responsibility for enforcing federal laws, *Printz*, 521 U.S. at 935, 117 S.Ct. 2365.

In *New York*, the Supreme Court struck down the Low–Level Radioactive Waste Policy Amendments Act, which required the states either to enact legislation providing for the disposal of radioactive waste or take title to the waste. The Court found that " 'the Act commandeers the legislative processes of the States by di-

rectly compelling them to enact and enforce a federal regulatory program.' " *Id.* at 176, 112 S.Ct. 2408 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). "No matter which path the State chooses, it must follow the direction of Congress." *Id.* at 177, 112 S.Ct. 2408. In *Printz*, the Court struck down provisions of the Brady Handgun Violence Protection Act that required state and local officers to perform background checks on those seeking to buy a handgun. Citing *New York*, the Court held that the federal government "may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935, 117 S.Ct. 2365. The Court found that the Act "effectively transfers [the President's] responsibility to thousands of [law enforcement officers] in the 50 states, who are left to implement the program without meaningful Presidential control (if indeed meaningful Presidential control is possible without the power to appoint and remove)." *Id.* at 922–23, 117 S.Ct. 2365.

The Indian Gaming Regulatory Act neither commandeers nor conscripts the governor (or the state) to enact or administer a federal regulatory program. The gubernatorial concurrence presents the governor with a true choice: he may either do nothing or concur in the Secretary's two-part determination. *See Turfway Park*, 20 F.3d at 1415 ("[Interstate Horseracing Act of 1978] ... does not require a State to do *anything* when presented with a request for its consent to off-track betting" and thus does not violate Tenth Amendment) (emphasis in original). Moreover, if the governor opts to do nothing the status quo remains intact. Unlike the "choice" presented by the statute in *New York*, the

governor (or the state) need not enact legislation, promulgate rules or enforce a federal regulatory program. The effect of the governor's inaction is to preserve the general federal prohibition of gaming on newly acquired off-reservation land. That result does not amount to "regulation." The gubernatorial concurrence does not offend the Tenth Amendment or principles of federalism.

### 4. *Equal protection*

Although plaintiffs asserted an equal protection claim in their complaint, they failed to argue it in their briefs. "Arguments not developed in any meaningful way are waived." *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir.1999).

### 5. *Severability*

Because I find that the Indian Gaming Regulatory Act's gubernatorial concurrence provision, 25 U.S.C. § 2719(b)(1)(A), is constitutional, it is unnecessary to address the parties' severability arguments.

## C. *Conditional Motion to Amend Complaint*

Plaintiffs have moved "conditionally" for leave to amend their complaint. The conditional event is a ruling by this court that the gubernatorial concurrence provision is constitutional. Now that this has happened, plaintiffs want the opportunity to argue that the governor's non-concurrence is invalid because former Governor McCallum failed to concur with the Secretary's two-part determination that (1) "a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members" and (2) "would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A). Plaintiffs characterize former Governor McCallum as "not properly apply[ing] the two factors" and "completely ignor[ing] the

standards provided by Congress." Plts.' Br., dkt. # 22, at 51, 53.

Plaintiffs do not explain whether they are seeking to assert another claim or simply raising an argument that they failed to make during the briefing on the cross-motions for judgment on the pleadings. They argue first that they are not required to plead legal theories in their complaint and second, that they are *not* seeking to add any additional factual allegations to the complaint. Instead, they say that they wish to amend their complaint "to put the parties and the Court on notice that the already-alleged facts, in light of defendants' new position with respect to the interpretation of the statute at issue, give rise to a legal theory not addressed in the pending motions for judgment on the pleadings, a theory that may become ripe depending on how those motions are resolved." Plts.' Reply, dkt. # 31, at 3. It appears that plaintiffs are attempting to cloak an undeveloped argument as a "claim" that needs to be added to the complaint.

Whatever the true nature of plaintiffs' proposed amendment, it comes too late in this suit. Plaintiffs filed this lawsuit on May 10, 2001, and filed their first amended complaint on July 2, 2001. Plaintiffs assert that they could not have amended their complaint earlier because they needed to know whether this court found the gubernatorial concurrence constitutional but fail to explain why they had to know the validity of the concurrence before making their argument. It is reasonable to expect counsel to make all their arguments at one time, even if some of the arguments are conditional upon the outcome of others.

■■■ Although leave to amend a complaint should be freely granted when justice so requires, *see* Fed.R.Civ.P. 15(a), a court need not allow an amendment when there is undue delay, bad faith, dilatory

motive, undue prejudice to the opposing party, or when the amendment would be futile. *Bethany Pharmacal Co., Inc. v. QVC, Inc.,* 241 F.3d 854, 860–61 (7th Cir. 2001). At a minimum, plaintiffs' motion comes within the category of undue delay. As plaintiffs concede, the factual basis of their new claim is identical to the factual basis of their constitutional and breach of trust claims; therefore, plaintiffs could have brought this new claim at the time they filed their original complaint. *See Kleinhans v. Lisle Savings Profit Sharing Trust,* 810 F.2d 618, 625 (7th Cir.1987) ("In view of [plaintiff's] failure to adequately explain the unreasonable delay in moving to amend his complaint to state a claim for punitive damages when all of the information necessary to stating such a claim has been available to him for eighteen months, we agree with the judgment and reasoning of the district court that [plaintiff's] motion represents an apparent attempt to avoid the effect of summary judgment [on his other claims].") (Internal quotation marks omitted).

Former Governor McCallum is no longer a party to this case. He intervened in his official capacity; under Fed.R.Civ.P. 25(d)(1), his successor, James E. Doyle was substituted as a party. Moreover, plaintiffs have not explained what kind of a claim they would be bringing against McCallum (or against the other defendants for McCallum's alleged failure to carry out his duty properly). They are seeking declaratory and injunctive relief; McCallum is no longer governor and therefore not in a position to provide such relief. Neither the state nor present Governor Doyle would be proper defendants; they are not accused of violating the law. Plaintiffs cannot sue the federal defendants under 42 U.S.C. § 1983 because § 1983 actions can be maintained only against persons who take action under color of *state* law to violate the constitutional rights of others. Plaintiffs cannot sue any of the defendants

under the federal Administrative Procedure Act; that act cannot provide a jurisdictional basis for a claim that a state governor acted improperly. Plaintiffs' conditional motion to amend their complaint will be denied for undue delay and for plaintiffs' failure to show that allowing such an amendment would not be a futility.

### ORDER

IT IS ORDERED that

1. Plaintiffs' motion for judgment on the pleadings is DENIED;

2. Defendants' and defendant-intervenors' motion for judgment on the pleadings is GRANTED;

3. Plaintiffs' conditional motion to amend the complaint is DENIED; and

4. The clerk of court is directed to enter judgment in favor of defendants and defendant-intervenors and close this case.